# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SKYE MINERAL INVESTORS, LLC )
and CLARITY COPPER, LLC, directly )
and derivatively on behalf of SKYE )
MINERAL PARTNERS, LLC, )
                                )
            Plaintiffs, )
                                )
      v. )          **C.A. No. 2018-0059-JRS**
                                )
DXS CAPITAL (U.S.) LIMITED, )
PACNET CAPITAL (U.S.) LIMITED, )
MARSHALL COOPER, SANJIV )
NORONHA, WATERLOO STREET )
LIMITED, LIPPO CHINA )
RESOURCES LTD., MICHAEL )
RIADY, STEPHEN RIADY, and )
NOBLE AMERICAS CORP., )
                                )
            Defendants, )
                                )
         and )
                                )
SKYE MINERAL PARTNERS LLC, )
                                )
       Nominal Defendant. )

# MEMORANDUM OPINION

Date Submitted: November 25, 2019
Date Decided: February 24, 2020

Rudolf Koch, Esquire and Kevin M. Gallagher, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Jason Cyrulnik, Esquire, Edward Normand, Esquire and Marc Ayala, Esquire of Boies Schiller Flexner LLP, Armonk, New York, Attorneys for Plaintiffs Skye Mineral Investors, LLC and Clarity Copper, LLC.

Thomas W. Briggs, Jr., Esquire and Aubrey J. Morin, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Pedro A. Jimenez, Esquire, Kevin C. Logue, Esquire, Kevin P. Broughel, Esquire, Nicholas Bassett, Esquire, Katherine K. Solomon, Esquire, Katherine Rookard, Esquire of Paul Hastings LLP, New York, New York, Attorneys for Defendants DXS Capital (U.S.) Limited, PacNet Capital (U.S.) Limited, Marshall Cooper, Sanjiv Noronha, Waterloo Street Limited, Lippo China Resources Ltd., Michael Riady and Stephen Riady.

Brett M. McCartney, Esquire and Elizabeth A. Powers, Esquire of Bayard, P.A., Wilmington, Delaware and James W. Anderson, Esquire, Walter A. Romney, Jr., Esquire and Shaunda L. McNeill, Esquire of Clyde Snow & Sessions, Salt Lake City, Utah, Attorneys for Defendant Noble Americas Corp.

**SLIGHTS, Vice Chancellor**

This dispute is among members of a Delaware limited liability company, Skye Mineral Partners, LLC ("SMP" or the "Company"). SMP's majority members allege that its minority members orchestrated a scheme wrongfully to divest SMP of its lone asset, a wholly owned operating subsidiary, CS Mining, LLC ("CSM"), by driving CSM into bankruptcy and then buying its assets at a steep discount in an auction sale conducted under Section 363 of the United States Bankruptcy Code. According to SMP's majority members, the scheme worked; their substantial investment in SMP has been looted by their one-time partners.

The scenario described above, at first glance, lacks intuitive congruence. How do minority members possess the means to ace the majority members out of their investment? The answer, according to Plaintiffs, lies in SMP's contractual governance scheme. SMP's constitutive documents granted the minority members certain blocking rights. It is alleged the minority members exercised those rights to drive CSM into bankruptcy, and then pounced on the opportunity to acquire CSM's valuable assets on the cheap when they came up for sale as part of the debtor's bankruptcy plan.

This scheme to divest SMP of its interests in CSM has prompted the majority members to bring a fifteen-count complaint in this Court. In their Second Amended Verified Complaint (the "Complaint"), now the operative complaint, Plaintiffs bring various iterations of claims against the minority members for breach of contract,

1

breach of the implied covenant of good faith and fair dealing (the "implied covenant"), breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contract, civil conspiracy and fraud.[1] They also bring claims for fraud, breach of contract, breach of the implied covenant and aiding and abetting breach of fiduciary duty against one of CSM's lenders for assisting the minority members in their scheme to chouse Plaintiffs out of their ownership interests in CSM.

All Defendants have moved to dismiss. Before getting to whether Plaintiffs have well pled their various claims, Defendants maintain that Plaintiffs confront a legal challenge at the threshold because claims belonging to the bankrupt CSM were discharged and released as part of the confirmation of CSM's bankruptcy sale. According to Defendants, all of the claims asserted here belonged to CSM, have now been released and cannot be revived on the pretense that SMP and its members have also suffered harm. Beyond this potentially dispositive threshold barrier, Defendants argue the Complaint fails for want of proper service and personal jurisdiction over certain Defendants and for failure to state viable claims under Court of Chancery Rule 12(b)(6).

---

[1] D.I. 52.

For reasons I explain below, I reserve my ruling on Defendants' service and related jurisdictional defenses for another day. As for Defendants' Rule 12(b)(6) arguments, my ruling is a mixed bag. Plaintiffs have failed to plead viable claims against CSM's lender. Their attempt to hold individuals and entities who sit atop the minority members' ownership structure directly accountable for the minority members' actions based on strained agency theories also fails as a matter of law. Plaintiffs, however, have adequately stated claims against the minority members of SMP for intentionally using their blocking rights to cause harm to SMP in a manner that was not exculpated by the clear terms of SMP's constitutive documents. This alleged conduct supports both the direct and derivative contract-based and fiduciary-based claims asserted against the minority members in the Complaint. Plaintiffs have also well pled that entities and individuals within the minority members' ownership group conceivably aided and abetted the fiduciary breaches. They have not, however, met the heightened burden imposed by our rules to plead fraud. Thus, as explained below, the Motions to Dismiss must be granted in part and denied in part.

## I. BACKGROUND

I have drawn the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and judicially noticeable

3

facts.[2]  In resolving the Motions to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[3]

## A. Parties and Relevant Non-Parties

SMP is a Delaware LLC.[4]  Virtually all of SMP's assets consisted of its ownership interest in CSM.[5]  At all times relevant here, SMP owned more than 99% of CSM and was its managing and majority member.[6]

SMP's Board of Managers (the "Board") comprised three members, each appointed by SMP's members.[7]  Plaintiffs, Skye Mineral Investors, LLC ("SMI") and Clarity Copper, LLC ("CC") appointed two Board members while Defendants, DXS Capital (U.S.) Limited ("DXS") and PacNet Capital (U.S.) Limited

---

[2] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that the Court may consider documents "incorporated by reference" or "integral" to the complaint on a motion to dismiss).

[3] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[4] *See* Defs.' Mot. to Dismiss Pls.' Second Verified Am. Compl. Pursuant to Ct. Ch. R. 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6) (D.I. 60) ("MTD") Ex. 1 ("SMP Agreement"), Recital D.  This Court may take judicial notice of Exhibits 1–12 attached to the MTD as documents publicly filed in the courts of other jurisdictions. *See In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *9 (Del. Ch. Sept. 28, 2007); *see also In re Gardner Denver, Inc.*, 2014 WL 715705, at *4 (Del. Ch. Feb. 21, 2014) (observing that, under Rule 12(b)(6), a court may consider documents integral to a complaint without converting a motion to dismiss into a motion for summary judgment).

[5] Compl. ¶ 33.

[6] Compl. ¶ 34.

[7] Compl. ¶ 23.

4

("PacNet"), appointed the third, Defendant, Marshall Cooper.[8] Cooper is an individual residing in Jakarta, Indonesia.[9]

Defendant, Sanjiv Noronha, is an individual residing in Singapore.[10] Plaintiffs allege Noronha is "affiliated" with Defendant, Lippo China Resources Ltd. ("LCR"), and "represented" Defendant, Waterloo Street Limited ("Waterloo"), in various matters relating to the claims.[11]

Defendant, Stephen Riady, is an individual residing in Singapore.[12] He is a son of non-party, Mochtar Riady (the alleged "patriarch" of the Riady family), and is the Executive Chairman of LCR.[13] Defendant, Michael Riady, is an individual residing in Florida.[14] He is a grandson of Mochtar Riady.[15]

---

[8] Compl. ¶¶ 23, 27, 37.

[9] Compl. ¶ 27.

[10] Compl. ¶ 28.

[11] Compl. ¶¶ 28, 123.

[12] Compl. ¶ 30.

[13] *Id.*

[14] Compl. ¶ 29.

[15] *Id.*

The Complaint refers to Defendants DXS, PacNet, Waterloo, LCR, Stephen Riady, Michael Riady, Noronha and Cooper as the "Lippo Group" or "Lippo."[16] Under the umbrella of the "Lippo Group," the Complaint describes a hierarchical structure established to manage the Riady family's investments.[17] Together, the Lippo Group "generates approximately $8 billion in revenue annually," contributing to Mochtar Riady's $2.3 billion personal net worth.[18]

Within the Lippo Group, the Complaint alleges (on information and belief) that "the Riady family, and/or its affiliates and controlled parties" own and control LCR.[19] It is also alleged that Cooper "has been an employee of the Lippo Group for 18 years" and "reported to" Michael Riady and LCR's board of directors.[20] Noronha "worked for" and "reported to" Stephen Riady.[21] According to Plaintiffs, Cooper, Noronha, PacNet and DXS are "agents" of Michael Riady, Stephen Riady and

---

[16] Compl. ¶ 2. I refer to the Lippo Defendants as "Lippo" or the "Lippo Group." I refer to all Defendants (including Noble Americas Corp.) collectively as "Defendants."

[17] Compl. ¶¶ 10, 12–14, 128.

[18] Compl. ¶ 82.

[19] Compl. ¶ 26.

[20] Compl. ¶¶ 128(a), (c), (g) ("Michael Riady had the ability to fire Cooper."), (h) ("Cooper . . . would not go against [the Lippo Group's] direction.").

[21] Compl. ¶ 128(n).

6

LCR.[22]  As for Cooper, the Complaint alleges he made clear to the other members of the Board that he would need to confer with "the family" before making any decision respecting SMP.[23]

Defendant, Noble Americas Corp. ("Noble"), was a lender to CSM.  It is alleged that Noble's loan to CSM was a necessary instrument in the Lippo Group's scheme to divest SMP of its ownership interests in CSM.[24]

For clarity, I illustrate the relevant entities and their relationship to each other in the chart below:[25]

*Remainder of Page Intentionally Left Blank*

---

[22] Compl. ¶ 137.

[23] Compl. ¶ 128(h).

[24] Compl. ¶¶ 50–51.

[25] Chart compiled from Compl. ¶¶ 1, 9, 22–32, 34–35.



**B. The SMP Agreement**

The operative foundational agreement for SMP is the Third Amended and Restated Limited Liability Company Agreement (the "SMP Agreement").[26] I summarize the relevant provisions of that agreement below.

---

[26] Compl. ¶ 36; MTD (D.I. 60) Ex. 1. The SMP Agreement is governed by Delaware law. Compl. ¶ 36.

### 1. Managers' Fiduciary Duties

SMP is a manager-managed LLC.[27]  As a baseline, the SMP Agreement did *not* eliminate SMP's managers' fiduciary duties.  Instead, it provides, in relevant part, "[e]xcept as otherwise set forth in this Agreement, a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders."[28]

In further refinement of the governance standard for managers, Section 5.1(f) of the SMP Agreement makes clear that SMP's managers' duties are analogous to those owed by directors of Delaware corporations with exculpatory charter provisions as authorized under 8 *Del. C.* § 102(b)(7):

> Each Manager will not be liable or obligated to the Members for any mistake of fact or judgment . . . unless such act or failure to act involved such Manager's breach of fiduciary duty or a breach of this Agreement, in which case such Manager will cease to be exempt from liability to the Company and the other Members for any such loss to the same extent such exemption from liability is not permitted by the General Corporation Law of the State of Delaware [(the "DGCL")].  A Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a Profit for the Members from the operations of the Company.  A Manager will not be responsible to any Member because of a loss of their investment or a loss in operations unless such loss is the result of such Manager's breach of this Agreement, in which event such Manager will cease to be exempt from liability to the Company

---

[27] SMP Agreement § 5.1.

[28] SMP Agreement § 5.1(g).

and the other Members for any such loss to the same extent such exemption from liability is not permitted by the [DGCL].[29]

With respect to corporate opportunities, the SMP Agreement provides that SMP's managers "may have other business interests."[30] Specifically, "[e]ach Manager and its respective affiliates may, notwithstanding the existence of this Agreement, engage in whatever activities such Manager or its Affiliates may choose, without having or incurring any obligation to offer any such interest in such activities to the Company or to the Members."[31]

## 2. Members' Fiduciary Duties and Control Rights

As for the members of SMP, the SMP Agreement provides, "[i]n view of the limited purposes of the Company, no Member or any of its Affiliates shall have any fiduciary obligations with respect to the Company or to the other Members *insofar as making other investment opportunities available to the Company or to the other Members*."[32] Relatedly, SMP's members can give or withhold, condition or delay their "votes, approvals, or consents" in their "sole and absolute discretion."[33] This

---

[29] SMP Agreement § 5.1(f).

[30] SMP Agreement § 5.1(h).

[31] SMP Agreement § 5.1(h).

[32] SMP Agreement § 4.3 (emphasis supplied).

[33] SMP Agreement § 4.6.

right is potent because Section 4.6(b) of the SMP Agreement prohibits SMP and CSM from taking certain actions unless 75% of the holders of SMP's outstanding class A units approve.[34] Among the acts requiring 75% approval are:

- Granting or pledging any security interest, lien or encumbrance;[35]

- Issuing units of any class to an existing member or a new member;[36] and

- Entering into a merger or a sale of substantially all the Company's assets[37] (collectively, the "Blocking Rights").

In short, given that together they held greater than 25% of SMP's outstanding class A units, DXS and PacNet, even as minority members, possessed significant control rights under the SMP Agreement.[38]

On top of the Blocking Rights, DXS negotiated additional negative control rights. Relevant here, with the exception of a few narrow carve outs, the Company could not approve an annual budget or take on material debt without DXS's approval.[39]

---

[34] SMP Agreement § 4.6(b)(i); SMP Agreement (definition of "Requisite Holders").

[35] SMP Agreement § 4.6(b)(i)(7).

[36] SMP Agreement § 4.6(b)(i)(10).

[37] SMP Agreement § 4.6(b)(i)(12), (13).

[38] *See* Compl. ¶ 35 (DXS and PacNet held 13.8% and 14.27% of the Company's class A units.).

[39] SMP Agreement § 4.6(b)(ii); Compl. ¶ 44.

11

### 3. Observer Rights

The SMP Agreement gave DXS special observer rights. Specifically, DXS could "appoint a representative" who would "attend all meetings of the [Board] in a nonvoting observer capacity."[40] In exchange for this right, DXS promised to secure its representative's promise "to hold in confidence and trust all information provided to it or learned by it in connection with its rights under this Agreement."[41] DXS appointed Noronha as its "representative."[42]

### 4. Member Loans

Section 3.5 of the SMP Agreement authorized the Board to cause the Company to borrow from the members.[43] In the event any member made a loan to the Company, the other members had a right to participate in the loan on a *pro rata* basis.[44] As alleged, Section 3.5 requires Board authorization before "a member [can be] a lender to the [C]ompany."[45]

---

[40] SMP Agreement § 5.1(l)(i).

[41] SMP Agreement § 5.1(l)(ii).

[42] Compl. ¶ 143.

[43] SMP Agreement § 3.5.

[44] SMP Agreement § 3.5.

[45] Compl. ¶ 43.

12

## C. CSM's Business Prior to the Alleged "Divestiture"

CSM owned valuable mineral deposits.[46] Even so, SMP appreciated that 75% of CSM's mineral deposits would remain in the ground unless and until CSM expanded its processing facility.[47] To accomplish this required expansion of its processing capacity, SMP and CSM initiated a capital project known as "Phase II."[48] In the run-up to Phase II, Cooper discovered key information regarding the full value of CSM's mineral deposits while acting as a SMP manager.[49] Specifically, non-party Newmont Mining advised Cooper that CSM possessed "world class" (albeit untapped) mineral deposits worth at least $600 million.[50] Even though he learned this information as a member of the Board, Cooper shared it with only DXS and PacNet; he kept it from SMI and CC.[51]

---

[46] Compl. ¶¶ 48–49.

[47] Compl. ¶ 49.

[48] *Id.*

[49] Compl. ¶ 71.

[50] *Id.*

[51] *Id.*

**D. The Noble Loan**

In August 2014, Noble loaned $30 million to CSM (the "Noble Loan") to finance CSM's Phase II capital project.[52] The contract governing the Noble Loan (the "NLA") stated, in its recitals, that it was an agreement "by and between" CSM (as borrower) and Noble (as lender).[53] And CSM and Noble were the only signatories to the NLA.[54] Because it was a part of a broader transaction between Noble, CSM and SMP, the NLA references SMP in its definition of "Loan Parties."[55] That definition, in turn, references *other* agreements to which SMP was a party.[56] One of those separate agreements was the "Intercreditor Agreement" whereby SMP agreed to subordinate its loans to CSM to the Noble Loan.[57] Notwithstanding the NLA's references to other agreements and non-parties, Noble and CSM agreed that "nothing in [the NLA], express or implied, shall be construed to confer upon any

---

[52] MTD (D.I. 60) Ex. 8; Compl. ¶¶ 50–51.

[53] NLA at CSMining0033526 (recitals).

[54] NLA at CSMining0033580–81.

[55] NLA § 1.01 (definition of "Loan Parties" and "Loan Documents"); Compl. ¶ 55.

[56] NLA § 1.01 (definition of "Loan Parties" and "Loan Documents").

[57] Compl. ¶ 55; NLA §§ 1.01 (definition of "Loan Documents"), 8.01(m) (Under the NLA, the voiding, repudiation or suspension of any Loan Document constituted an event of default.).

14

Person (other than the parties hereto,[)] . . . any legal or equitable right, remedy or claim under or by reason of [the NLA]."[58]

The NLA was not a typical commercial financing agreement in that Noble did not extend credit under the NLA as a traditional lender but as the exclusive purchaser of CSM's copper.[59]  Because of the significant leverages Noble enjoyed as CSM's senior secured creditor and exclusive customer, Noble was prohibited from selling the Noble Loan to a member of the Lippo Group (the "Insider Sale Prohibition").[60] SMP's members negotiated the Insider Sale Prohibition specifically "to prevent one of SMP's members from benefitting from a default by [CSM]."[61]

As explained below, CSM fell behind on its Noble Loan payments.  This delinquency eventually prompted Noble to declare an event of default.[62]  Under the NLA, upon declaring an event of default, Noble could accelerate payments, foreclose on CSM's assets or sell the Noble Loan without CSM's consent.[63] Following Noble's declaration of default, on December 7, 2015, CSM and Noble

---

[58] NLA § 9.07(a).

[59] Compl. ¶ 56.

[60] Compl. ¶ 92.

[61] *Id.*

[62] Compl. ¶ 95.

[63] *Id.*; NLA § 8.02.

negotiated a fourth amendment to the NLA (the "Fourth Amendment") to forestall Noble's acceleration of the debt.[64] The Fourth Amendment, in turn, waived the Insider Sale Prohibition.[65] Thus, once CSM defaulted and the parties signed the Fourth Amendment, Noble was free to sell the Noble Loan to whomever it wanted, including members of the Lippo Group.[66]

### E. The Lippo Group's Alleged Scheme

Plaintiffs allege the Lippo Group hatched a scheme in 2014 to wrest control of SMP's valuable assets from CC and SMI.[67] Step one of the scheme began in late 2014, when DXS and PacNet began to block "reasonable financing proposals" for SMP.[68] For instance, they blocked a *pro rata* equity round for SMP in 2015 despite knowing that SMP needed capital to fund CSM's obligations under the NLA and Phase II.[69] SMI and CC tried to save the Company with a $5 million equity investment.[70] In response, DXS and PacNet filed a declaratory judgment action in

---

[64] Compl. ¶¶ 93, 98, 102.

[65] Compl. ¶ 93.

[66] *Id.*

[67] Compl. ¶ 9.

[68] Compl. ¶ 57.

[69] *Id.*

[70] Compl. ¶ 64.

this court, where they sought to enforce the Blocking Rights in order to prevent the $5 million investment.[71] In their complaint, DXS and PacNet alleged, "pursuant to the SMP [Agreement], DXS and PacNet's prior written approval is required before (i) SMP issues any Membership interest to any existing Member or new Member of SMP, or (ii) SMP or [CSM] enters into any agreement with respect to incurring significant debt or pledging its assets as security to any creditor."[72]

With step one of the scheme in full swing, and CSM withering on the vine, the Lippo Group initiated step two in the summer of 2015.[73] As revealed in an October 2015 email from Cooper to Noronha (the "Cooper/Noronha Email"), the Lippo Group commenced discussions with Noble to buy the Noble Loan notwithstanding the Insider Sale Prohibition:

> Then I would at request of Noble, consider buying that debt at a large discount, which the [Riady] family would then have full security and take some upside on debt. **Then we can sit back and hold our position and when this collapses we have the first lien and can buy it out of bankruptcy very cheap.**[74]

---

[71] *Id.*

[72] Compl. ¶ 45 (citing Verified Compl. for Declaratory J. ¶ 30, *DXS Capital (U.S.) Ltd. v. Skye Mineral Inv'rs LLC*, C.A. No. 10794-VCG (Del. Ch. May 15, 2015)).

[73] Compl. ¶¶ 69, 77.

[74] Compl. ¶ 80 (emphasis in original).

17

Because of CSM's deteriorating condition, Noble notified SMP and all of its members that it would be interested in selling the Noble Loan.[75]  But, "contrary to what [Noble] actually had been negotiating with the Lippo Group behind Plaintiffs' backs," Noble did not tell Plaintiffs "that it would be willing to [sell its loan] at a substantial discount."[76]  Plaintiffs now allege Noble was motivated to keep its discussions with the Lippo Group hidden from Plaintiffs because Noble had significant commercial relationships with the Lippo Group apart from its dealings with SMP and CSM.[77]

Noble had loaned real money to CSM.[78]  When CSM defaulted, therefore, it came as little surprise that Noble insisted that CSM agree to the Fourth Amendment.[79] Plaintiffs now dispute whether it was in Noble's interest actually to foreclose on CSM's assets, but Noble at least had the right to accelerate the $30 million loan and foreclose—which would have doomed CSM.[80]

---

[75] Compl. ¶ 82.

[76] *Id.*

[77] *Id.*

[78] Compl. ¶ 50.

[79] Compl. ¶¶ 93, 95.

[80] NLA § 8.02; Compl. ¶¶ 96, 102.

On December 7, 2015, CSM and Noble executed the Fourth Amendment, thereby waiving CSM's event of default while also deleting the Insider Sale Prohibition from the NLA.[81] At about this time, Cooper "flat-out lied" when he stated to the other Board members that he was not involved in any discussions to purchase the Noble Loan.[82] Even so, Plaintiffs *knew* this was false given the Lippo Group's prior revelation "that they had been negotiating with Noble" as early as 2015.[83]

While the Fourth Amendment gave SMP a reprieve from the impending Noble Loan default, DXS and PacNet advanced their scheme to the third step by inducing SMI and CC to infuse more equity capital into SMP in order to keep CSM afloat while intending to seize CSM's assets when it "collapsed."[84] In late 2015, SMI and CC invested another $6.8 million in SMP.[85] They agreed to make this investment knowing the Lippo Group had been in discussions to acquire the Noble Loan and that the Insider Sale Prohibition was gone.[86]

---

[81] NLA at CSMining0033692–93; Compl. ¶ 102.

[82] Compl. ¶ 104.

[83] Compl. ¶ 66.

[84] Compl. ¶¶ 91, 107.

[85] *Id.*

[86] Compl. ¶¶ 54, 66–68.

19

On December 24, 2015, Plaintiffs learned Lippo was on the brink of acquiring the Noble Loan when they were "mistakenly" copied on an email between Noble and the Lippo Group.[87] Plaintiffs objected and sought to stop the sale, but on December 31, 2015, Noble sold the Noble Loan to Waterloo (a Lippo affiliate) for $23 million, a substantial loss for Noble.[88] LCR (an entity for which Stephen Riady served as Executive Chairman) specifically approved Waterloo's acquisition of the Noble Loan.[89]

After acquiring the Noble Loan, Noronha represented Waterloo in its dealings with CSM.[90] Noronha, in turn, "worked for" and "reported to" Stephen Riady.[91] Through this web of relationships, Plaintiffs allege the "Lippo Group" caused "its agents," Cooper and Noronha, to take harmful actions in furtherance of the divestiture scheme that were not approved by SMP's Board.[92] Specifically, Cooper and Noronha:

---

[87] Compl. ¶ 108.

[88] Compl. ¶ 111.

[89] Compl. ¶¶ 30, 128(p)

[90] Compl. ¶ 123.

[91] Compl. ¶ 128(n).

[92] Compl. ¶ 115.

- "directed SMP management how to spend [] funds to advance Lippo's self-interest[]" and "depress[ed] the value and financial abilities of SMP"[93] and

- "instructed SMP management" to cause CSM to ramp-up borrowing under the Noble Loan and directed SMP's management "as to which account payables to satisfy" (collectively, the "Unauthorized Acts").[94]

The Unauthorized Acts improved the Lippo Group's position in CSM's looming bankruptcy.[95] And, as the Lippo Group had planned, CSM entered bankruptcy in June 2016.[96]

## F. The CSM Bankruptcy

On August 18, 2017, the United States Bankruptcy Court for the District of Utah (the "Utah Bankruptcy Court") issued an order (the "Sale Order") approving the sale of CSM's assets under Section 363 of the Bankruptcy Code.[97] Non-party, Tamra Mining Company, LLC (the "Buyer"), acquired all of CSM's assets for

---

[93] Compl. ¶¶ 115 (alleging the Lippo Group caused its agents to take harmful actions such as "substantial staff reductions, directing payments to specific vendors, suggested modifications to equipment loans, and material changes to operational plans"), 121 (alleging Cooper and Noronha "instructed SMP management to cause CSM to draw down the full principal amount of the Noble Loan and caused CSM to undertake a $5 million high-interest-rate loan" and then "directed SMP management how to spend the funds").

[94] Compl. ¶¶ 116, 120, 121–22, 128(r).

[95] Compl. ¶¶ 116, 120, 121–22.

[96] Compl. ¶ 126.

[97] 11 *U.S.C.* § 363; Transmittal Aff. of Aubrey J. Morin in Supp. of Defs.' Opening Br. in Supp. of Mot. to Dismiss Pls.' Second Am. Verified Compl. Pursuant to Ct. Ch. R. 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6) ("Morin Aff.") (D.I. 60) Ex. 2 (the "Sale Order").

$40 million in a court-supervised sale.[98]  The Buyer is not a party to this litigation, but it is affiliated with the Lippo Group.[99]

The Sale Order provided that the Buyer purchased CSM's assets "free and clear of all Interests of any kind or nature whatsoever."[100]  Among the purchased assets were any claims CSM had against Lippo.[101]  But the Sale Order said nothing about claims *SMP* might have against Lippo.  Indeed, during the hearing to approve the Sale Order, the parties represented to the Utah Bankruptcy Court that the Sale Order contained "no releases with respect to any direct claims at any other third parties or any impairment of any other third party's legal rights and recoveries against anyone else in connection with this particular sale of claims."[102]

## G. Procedural Posture

Plaintiffs filed their original complaint on January 24, 2018.[103]  Later, on February 16, 2018, PacNet, DXS and Cooper removed the case to the United States

---

[98] Compl. ¶ 126.

[99] *Id.*

[100] Sale Order at 21.

[101] Morin Aff. Ex. 3 at 96.

[102] Morin Aff. Ex. 3 at 100.

[103] D.I. 1.

Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").[104]

Meanwhile, the Utah Bankruptcy Court had entered the Sale Order, but litigation between Lippo and Plaintiffs dragged on in that court as well. On February 15, 2018, the Buyer sought to enjoin Plaintiffs from proceeding in this court on grounds that the claims asserted here are barred by the Sale Order. On June 1, 2018, the Utah Bankruptcy Court held it lacked jurisdiction to issue such an injunction.[105] And, on December 3, 2018, the Delaware Bankruptcy Court remanded the case to this court.[106]

On January 14, 2019, Plaintiffs amended their original complaint.[107] After Defendants filed Motions to Dismiss, Plaintiffs filed the now operative Complaint.[108] Defendants have again filed Motions to Dismiss under Court of Chancery Rules 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6).[109]

---

[104] D.I. 11.

[105] *In re CS Mining, LLC*, 2018 WL 2670457, at *8–9 (Bankr. D. Utah. June 1, 2018).

[106] D.I. 17.

[107] D.I. 18.

[108] D.I. 52.

[109] D.I. 60.

## II. ANALYSIS

While the arguments raised in the Motions to Dismiss are multi-layered, as one might expect when several defendants seek dismissal of a fifteen-count Complaint, the arguments can be placed into four broad categories:

- Stephen Riady and Noronha have not been properly served, so the claims against them should be dismissed under Rule 12(b)(4) & (5);[110]

- This Court lacks personal jurisdiction over Noronha, LCR, Waterloo, Stephen Riady and Michael Riady, so the claims against them should be dismissed under Rule 12(b)(2);[111]

- Plaintiffs have failed to meet the heightened pleading standard of Rule 9(b) required to state a claim for fraud;[112]

- Plaintiffs' other claims should be dismissed under Rule 12(b)(6) for failure to plead viable claims.[113]

During the hearing on Defendants' Motions to Dismiss, I observed that Lippo's Motions concerning inadequate service of process had not been properly

---

[110] Opening Br. in Supp. of Defs.' Mot. to Dismiss the Verified Second Am. Compl. ("DOB") (D.I. 60) at 10–12.

[111] DOB at 13–17.

[112] Def. Noble Am. Corp.'s Opening Br. in Supp. of Mot. to Dismiss Second Am. Verified Compl. ("NOB") (D.I. 59) at 36; DOB at 42.

[113] DOB at 18–58.  I note that Lippo does not raise Rule 23.1 in the Motions to Dismiss even though Plaintiffs purport to bring derivative claims on behalf of SMP.  As a result, I do not analyze whether the Complaint meets the heightened pleading standards of Rule 23.1.

joined for decision.[114] That issue turns on a foreign sovereign's legal standards concerning which the record, as it stands, contains directly competing affidavits from foreign law experts.[115] I am reserving judgment on Lippo's Rule 12(b)(4) and (5) Motions until the record on foreign law is further developed.[116] I address the remaining grounds stated in Defendants' Motions below.

## A. Personal Jurisdiction

The Lippo Group contends this Court lacks personal jurisdiction over Noronha, Stephen Riady, Michael Riady, Waterloo and LCR.[117] When responding to a motion to dismiss under Court of Chancery Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction."[118] "In ruling on a 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery record. If [as here] . . . no evidentiary hearing has been held, plaintiffs

---

[114] *See* Tr. of Oral Arg. on Defs.' Mot. to Dismiss ("Tr.") (D.I. 95) at 109.

[115] Tr. at 109.

[116] *See Germaninvestments AG v. Allomet Corp.*, 2020 WL 414426 (Del. Jan. 27, 2020) (reversing trial court for failing to develop adequate record of foreign law before applying that law to decide a motion to dismiss under Rule 12(b)(3)).

[117] D.I. 60.

[118] *Konstantino v. AngioScore, Inc.*, 2015 WL 5770582, at *6 (Del. Ch. Oct. 2, 2015).

25

need only make a *prima facie* showing of personal jurisdiction, and the record is construed in the light most favorable to the plaintiff."[119]

Determining whether a Delaware court may exercise personal jurisdiction over a non-resident involves a two-step inquiry.[120]

> The court must determine, first, whether an applicable Delaware statute provides a means of exercising personal jurisdiction over a nonresident, and second, whether "subjecting the nonresident defendant to jurisdiction would violate due process." Due process requires that the "nonresident defendant . . . have sufficient minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[121]

Plaintiffs assert jurisdiction is proper under several theories.[122] As to Noronha, Stephen Riady, Michael Riady, Waterloo and LCR, Plaintiffs assert jurisdiction over these defendants under the Delaware long-arm statute, 10 *Del. C.* § 3104(c), and the conspiracy theory of jurisdiction, among other theories.[123] Because I find Plaintiffs have made a *prima facie* showing to establish personal jurisdiction under both theories, I end the analysis there.

---

[119] *Id.* (internal citation and quotation omitted).

[120] *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at \*5–6 (Del. Ch. Jan. 31, 2013), *revised* (Feb. 7, 2013).

[121] *Boulden*, 2013 WL 396254, at \*5 (quoting *Matthew v. Fläkt Woods Gp. S.A.*, 56 A.3d 1023, 1027 (Del. 2012)) (quotations omitted).

[122] *See* Pls.' Corrected Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("PAB") (D.I. 77) at 15–24.

[123] *See id.* at 20.

The conspiracy theory of jurisdiction "is based on the legal principle that one conspirator's acts are attributable to the other conspirators."[124]  Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[125]  The conspiracy theory is not an independent basis to demonstrate personal jurisdiction; it is, rather, a means by which a plaintiff may advance his case for personal jurisdiction under the long-arm statute.[126]

As our Supreme Court explained in *Instituto Bancario*, the conspiracy theory of personal jurisdiction requires the satisfaction of a five-part test:

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[127]

---

[124] *Matthew*, 56 A.3d at 1027.

[125] *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

[126] *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

[127] 449 A.2d at 225.

27

This five-part test "functionally encompass[es]" both prongs of the Delaware long-arm statute—which requires both a statutorily defined nexus to the state as well as compliance with constitutional notions of due process.[128] "Therefore, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test."[129]

Plaintiffs maintain they have met the *Instituto Bancario* test with well-pled allegations in their Complaint. Defendants disagree, arguing the Complaint fails adequately to allege that (i) a conspiracy was formed, and (ii) members of the supposed-conspiracy knew of and participated in substantial acts in furtherance of the conspiracy in Delaware.[130] I reject both challenges below.

### 1. The Conspiracy Among the Lippo Group

Under the *Instituto Bancario* test, I must first ask whether Plaintiffs have carried their *prima facie* burden to demonstrate a conspiracy existed and that each Lippo defendant was a member of the conspiracy. Although the first element of the test specifically mentions "a conspiracy to defraud," the test is not limited to that particular tort, and has been found to apply to conspiracies to breach fiduciary duties

---

[128] *Konstantino*, 2015 WL 5770582, at *7 (citing *Virtus*, 2015 WL 580553, at *12).

[129] *Id.* (quoting *Virtus*, 2015 WL 580553, at *12).

[130] *See* Reply Br. in Supp. of Defs.' Mot. to Dismiss the Verified Second Am. Compl. ("DRB") (D.I. 82) at 32; DOB at 55.

and aid and abet such breaches.[131] The existence of a conspiracy is tested by reference to an additional five elements: "(1) two or more persons; (2) some object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) resulting proximate damages."[132]

As discussed in greater detail below when addressing the viability of Plaintiffs' pled claims, the conspiracy that fairly can be gleaned from the record is that the members of the Lippo Group implemented a plan to starve SMP of capital and then drive CSM into bankruptcy so that Lippo could "buy [CSM's assets] out of bankruptcy very cheap."[133] This conspiracy, as alleged, meets the five requisite elements under Delaware law.

Lippo cites *In re Transamerica Airlines*, for the proposition that "a corporation generally cannot be deemed to have conspired with its wholly owned

---

[131] *See Virtus*, 2015 WL 580553, at *13; *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 636 (Del. Ch. 2013), *abrogated on other grounds*, *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 977 (Del. Ch. 2000) (rejecting construction of *Instituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

[132] *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011).

[133] Compl. ¶ 80.

subsidiary, or its officers and agents."[134]   But *Transamerica*, itself, noted that "this general rule does not apply [] when the officer or agent of the corporation steps out of her corporate role and acts pursuant to personal motives."[135]   With this in mind, "[Lippo's] argument—that entities with common equity ownership can never conspire illegally with one another—is not one that convinces me," at least not at this stage.[136]

I am also unpersuaded by Lippo's argument that the Complaint does not "include the necessary factual allegations reflecting a 'meeting of the minds.'"[137] "A plaintiff does not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators."[138]

---

[134] DOB at 57 (citing 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006)).

[135] *In re Transamerica*, 2006 WL 587846, at *6.

[136] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1044 (Del. Ch. 2006). In *Allied Capital*, then-Vice Chancellor Strine rejected the notion "that a parent and its subsidiary cannot conspire with one another because they don't possess two separate corporate consciousnesses (*i.e.*, that they have but one mind) and are thus incapable of agreement." *Id.*   Instead, he held, "[t]he fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme.  It is precisely because the corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy and aiding and abetting may have a policy purpose."  *Id.*

[137] DRB at 24.

[138] *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *22 (Del. Ch. June 23, 2015) (internal quotation omitted).

The Cooper/Noronha Email, by itself and on its own terms, supports a strong inference of an agreement between Cooper, Noronha, Stephen and Michael Riady and the entities they controlled (LCR, DXS, PacNet and Waterloo) to engage in the scheme at the heart of the alleged conspiracy.[139] The email uses the collective pronoun "we" to refer to Noronha, Cooper and the Riady family.[140] It is also reasonable to infer that the email describes, in detail, the Lippo Group's plan to tank SMP.[141] After the email was sent, Stephen and Michael Riady allegedly "directed" Cooper and Noronha as they implemented the Lippo Group's scheme while Waterloo acquired the Noble Loan (an acquisition LCR's board formally approved).[142] Given these acts, on top of the aligned incentives created by the Lippo Group's common ownership and direction under the Riady family, I find Plaintiffs have pled facts supporting a reasonable inference that Stephen Riady, Michael Riady, LCR, Cooper, Noronha and Waterloo agreed intentionally to scuttle SMP by divesting it of its ownership of CSM.

---

[139] Compl. ¶ 80 ("[T]he [Riady] family would then have full security and take some upside on debt. Then *we* can sit back and hold our position and when this collapses, *we* have the first lien and can buy it out of bankruptcy very cheap.") (emphasis supplied).

[140] Compl. ¶ 80.

[141] *Id.*

[142] Compl. ¶ 128(f), (k), (n), (p), (q).

## 2. The Acts in Delaware

The third, fourth and fifth elements of the *Instituto Bancario* test focus on acts committed in Delaware to advance the alleged conspiracy about which members of the conspiracy either knew or had reason to know.[143] The test does not require that any specific defendant perform such acts; instead, "one conspirator's acts are attributable to the other conspirators."[144] Ultimately, I am persuaded each member of the Lippo Group knew or had reason to know that members of the conspiracy acted in Delaware to further the conspiracy.

DXS and PacNet sued in Delaware to enforce their Blocking Rights.[145] Lippo cannot reasonably contend, at this stage, that this was not an act in furtherance of the group's plan.[146] Based on the scheme described in the Complaint, it is reasonable to infer that each member of the Lippo Group knew about the Delaware lawsuit, especially given Cooper's frequent consultation with "the [Riady] family."[147]

---

[143] 449 A.2d at 225.

[144] *Id.* at 222; *accord Fläkt Woods*, 56 A.3d at 1027; *Virtus*, 2015 WL 580553, at *13.

[145] Compl. ¶ 64.

[146] *See Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*, 833 F. Supp. 437, 446 (D. Del. 1993) ("By authorizing and directing the filing of Mobil's declaratory judgment lawsuit in Delaware, Mr. Herbst and Mr. Ferguson purposefully availed themselves of the benefits and protections of Delaware.").

[147] Compl. ¶ 128(h).

As for LCR and Waterloo's knowledge, "[w]hen a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties."[148] Cooper and Noronha allegedly were agents and representatives for both LCR and Waterloo, so their knowledge is imputed to their principals.[149] Moreover, since a central purpose of the alleged conspiracy was to drive SMP into insolvency by employing the Blocking Rights, it was foreseeable that DXS and PacNet would have to file suit in SMP's home (Delaware) to enforce their rights.

### 3. Due Process

Finally, this Court's exercise of personal jurisdiction over the members of the Lippo Group comports with due process (assuming proper service of process). Because it is reasonable to infer that the Lippo Group voluntarily participated in a conspiracy to harm SMP knowing that the scheme would require DXS, PacNet and Cooper to breach the fiduciary duties they owed to SMP, a Delaware LLC, it is fair

---

[148] *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 887 (Del. Ch. 2009); *see also* 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 790 (Sept. 2019) ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.").

[149] Compl. ¶¶ 123, 137.

and reasonable to require them to defend their conduct here, in the same forum the Lippo Group chose to adjudicate its declaratory judgment claims in the first place.[150] Put differently, by any reasonable measure, the Lippo Group should have expected that its plan might well lead Plaintiffs to haul them into this court to answer, at least, for their role in allegedly aiding and abetting breaches of fiduciary duty by Cooper as DXS and PacNet's Board designee.

******

For the reasons explained above, I conclude Plaintiffs have made a *prima facie* showing that all of the *Instituto Bancario* factors are satisfied such that this Court has personal jurisdiction over the Lippo Group's members (assuming proper service of process) under Delaware's long-arm statute and the conspiracy theory of jurisdiction.

## B. Defendants' Rule 12(b)(6) Arguments

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court applies a well-settled standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate

---

[150] *See Konstantino*, 2015 WL 5770582, at *10 (reaching a similar conclusion).

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[151]

I first take up Defendants' arguments that the Sale Order bars Plaintiffs' claims. I then address, in turn, Plaintiffs' breach of contract, breach of fiduciary duty, aiding and abetting, civil conspiracy, tortious interference with contract and fraud claims.

### 1. The Preclusive Effect of CSM's Bankruptcy Sale

Defendants argue the Sale Order precludes Plaintiffs' claims on three separate grounds: the claims are barred by *res judicata*; the *en rem* protections expressly provided for in the Sale Order bar the claims; and the claims are derivative on behalf of CSM, a now discharged bankrupt debtor, and cannot be brought by or on behalf of SMP. I address each ground below.

#### a. *Res Judicata*

*Res judicata* will bar a claim if the party asserting the defense can establish each of the following elements: (1) the court making the prior determination had jurisdiction; (2) the parties in the present action are either the same parties or are in privity with the parties from the prior adjudication; (3) the prior adjudication was final; (4) the causes of action were the same in both cases or the issues decided in the prior action were the same as those raised in the present case; and (5) the issues in the prior action were decided adversely to the party's contention in the instant

---

[151] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

action.[152]  Lippo's *res judicata* argument fails to satisfy either the fourth or fifth element.

In their effort to demonstrate the requisite consonance between the bankruptcy proceedings and the claims advanced here, Lippo vaguely points to certain objections Plaintiffs lodged with the Utah Bankruptcy Court before that court approved the Sale Order.[153]  In those objections, Plaintiffs leveled many of the same factual allegations against Defendants they now raise in the Complaint.[154]  According to the Complaint, however, the Utah Bankruptcy Court never reached the merits of Plaintiffs' allegations because it did not have to.[155]  The allegations were

---

[152] *Banet v. Fonds de Regulation et de Contro le Café Cacao*, 2010 WL 1066993, at *3 (Del. Ch. Mar. 12, 2010).

[153] DOB at 21 (citing Morin Aff. Ex. 4 at 7).

[154] *See, e.g.*, Morin Aff. Ex. 4 at 7 ("Lippo is, upon approval and closing of the Tamra Mining APA, on the cusp of successfully executing this illegal plan [of] . . . acquir[ing] the [Noble Loan] using inside information obtained from [the SMP Board] meetings and several hundred days on site at [CSM], us[ing] it as a leverage point to drive [CSM] into bankruptcy, and [] acquir[ing] the assets of [CSM] cheaply.").

[155] Compl. ¶ 4 (Plaintiffs are only bringing SMP's claims); *see also* Morin Aff. Ex. 4 at 5 (The objection quoted in the language, above, is found in a document titled "Objection to Sale Conducted by Auction on August 7, 2017" and a section titled "The Debtor Lacked Authority to Assign, Sell, or Release Certain Fiduciary Claims."); Morin Aff. Ex. 3 at 14, 16, 20–25, 28–31, 36–37 (alleging before the Utah Bankruptcy Court that the Lippo Group "embarked on a secret plan in violation of the Corporate Opportunity Doctrine"), 41–42, 45 (Plaintiffs arguing "there wasn't proper notice that the sale would include the sale of litigation assets"), 47 (the Utah Bankruptcy Court responding to Plaintiffs' allegations by granting the debtor's *motion to strike* testimony from a SMP witness who would support the allegations).

deemed irrelevant to the question before the court—was the sale of assets procedurally proper?[156] In other words, as alleged here, the Utah Bankruptcy Court did not consider, much less adjudicate, the merits of Plaintiffs' allegations that the Lippo Group had executed a plan wrongfully to divest SMP of its ownership interest in CSM. Thus, it is not clear from the Complaint that Plaintiffs "can prove no set of facts to avoid" the *res judicata* defense.[157]

### b. *En Rem* Protections Under 11 *U.S.C.* § 363

Lippo's next argument is that the Bankruptcy Code "comes with inherent protections designed to ensure [the] finality [of the bankruptcy proceedings]."[158] Specifically, according to Lippo, the Sale Order "judicially sanctioned" the transfer of assets "free and clear" of all interests, including litigation claims.[159] While not entirely clear, Lippo's theory seems to be that the Bankruptcy Code grants the Buyer

---

[156] As noted, the Utah Bankruptcy Court responded to Plaintiffs' allegations about Lippo's plan by granting a *motion to strike* and denying a motion that challenged the Sale Order. Morin Aff. Ex. 3 at 36–37, 47, 64–65, 67. Plaintiffs challenged the Sale Order because they "were excluded from bidding," which Plaintiffs alleged was inconsistent "with the business judgment rule." *Id.* The Utah Bankruptcy Court acknowledged Plaintiffs had made "strong representations." *Id.* at 69. But, because Plaintiffs failed to present any competent evidence at the hearing, the Utah Bankruptcy Court granted a motion to exclude Plaintiffs' objections without addressing them on the merits. *Id.* at 70.

[157] *Reid v. Spazio*, 970 A.2d 176, 183–84 (Del. 2009) (observing that "affirmative defenses . . . are not ordinarily well-suited for treatment" on a motion to dismiss).

[158] DOB at 22.

[159] *Id.*

37

certain *en rem* protections from collateral attack thereby cleansing any wrongdoing arising out of, or related to, the purchase of CSM's assets.[160]

Lippo's *en rem* argument leaves them well short of where they are trying to go. At most, the Bankruptcy Code protects the *Buyer* from collateral attacks; it does not protect others.[161] In this regard, a case Lippo cites, *In re Christ Hospital*, is instructive.[162] There, it was alleged that the successful bidder in a Section 363 sale had "forced" the debtor into bankruptcy and had committed various torts "in connection with" the 363 sale.[163] Nevertheless, the court held Section 363 barred the plaintiff from bringing its tort claims against the defendant-bidder because the claims were "obviously intertwined" with the sale.[164] But the court stopped noticeably short of suggesting that Section 363 protected any party *other than the*

---

[160] *See id.* at 22–23; DRB at 5–6.

[161] *In re Farmland Indus. Inc.*, 376 B.R. 718, 729 (Bankr. W.D. Mo. 2007), *aff'd*, 408 B.R. 497 (B.A.P. 8th Cir. 2009) (Section 363 "provides *purchasers . . .* protections from attacks.") (emphasis supplied); *In re Christ Hosp.*, 502 B.R. 158, 173 (Bankr. D.N.J. 2013) (same).

[162] 502 B.R. at 163.

[163] *Id.* at 163, 166.

[164] *Id.* at 163.

*buyer* from collateral attacks.[165]    Because the Buyer is not a party to this case, Section 363 does not, on its face, bar the Complaint.

### c. The Claims, As Pled, Belong to SMP, Not CSM

In a last-ditch effort to salvage a defense to the claims *sub judice* out of CSM's bankruptcy, Defendants argue the Complaint brings claims that were sold to the Buyer, as reflected in the Sale Order.[166]    In other words, Defendants claim Plaintiffs are misappropriating the Buyer's property—the litigation asset acquired under the Sale Order.    Yet, the Complaint acknowledges that Plaintiffs "do[] not assert any legal claims that CSM ever owned itself."[167]    According to the Complaint, while "Defendants' misconduct also may have harmed other parties, including CSM, [] Plaintiffs are not asserting claims to recover for the harm suffered exclusively by those other parties."[168]    Indeed, Plaintiffs acknowledge any claims CSM ever owned have been "disposed of" through CSM's asset sale under 11 *U.S.C.* § 363.[169]

---

[165] *Id.*; *see also In re NE Opco, Inc.*, 513 B.R. 871, 873, 876 (Bankr. D. Del. 2014) (granting a Section 363 purchaser protection from claims related to its pre-bankruptcy conduct because such claims were "related to [the purchaser's] impending purchase of assets").

[166] DOB at 19, 26–27; DRB at 2–3; NOB at 15–21.

[167] Compl. ¶ 4.

[168] *Id.*

[169] *Id.*; *see also* Compl. ¶ 19 n.1 ("This action does not challenge the bankruptcy sale itself, which was conducted in the wake of the destruction in value [at the SMP level] that Defendants' actions had caused.").

Defendants cannot bar the Complaint with the Sale Order. That document only purports to transfer *CSM*'s assets.[170] It says nothing of assets belonging to SMP. Moreover, the parties represented to the Utah Bankruptcy Court that the Sale Order did not release "any direct claims of any other third parties" or impair "any other party's legal rights."[171]

To be sure, CSM could not have sold any claims belonging to SMP in the bankruptcy proceedings or otherwise. In this regard, this court's decision in *Case Financial, Inc. v. Alden* is directly on point.[172] There, the court addressed whether a parent corporation had standing to sue for breach of fiduciary duty arising out of transactions entered into by its wholly owned subsidiary.[173] The defendant, "Alden," was a director and officer of both the parent and the subsidiary, yet the subsidiary had not sued Alden even though he had allegedly misappropriated the subsidiary's assets.[174] In a post-trial decision, the court observed that, in a parent-subsidiary context, each entity has its own set of fiduciaries.[175] Thus, even though

---

[170] Morin Aff. Ex. 2 at 2.

[171] Morin Aff. Ex. 3 at 100.

[172] 2009 WL 2581873 (Del. Ch. Aug. 21, 2009).

[173] *Id.*, at *3.

[174] *Id.*, at *3–7.

[175] *Id.*, at *7.

the subsidiary probably had derivative claims that it could have brought against Alden, the parent had its own standing to sue Alden for breach of fiduciary duty. The court wrote:

> Alden, as a director of [the parent], had a duty not to intentionally or knowingly participate in conduct that would injure [the parent]. Because Alden owed this duty to [parent] directly, [the parent's] ability to pursue a suit against Alden directly would not depend, in this sense, on whether the entirety of the damage was sustained directly by [parent] or derivatively through [the subsidiary]. To the contrary, if Alden was substantially certain his conduct would injure [parent] unjustifiably, regardless of how far down the causal chain the injury would occur, Alden should have refrained from the conduct.[176]

Similarly, SMP is owed fiduciary obligations from the fiduciaries named as defendants here that are separate from duties that may have been owed to CSM. Plaintiffs only purport to bring SMP's claims.[177] Whether Plaintiffs will be able to prove up claims and damages separate and apart from the claims belonging to CSM is a question for another day.[178] For now, Plaintiffs have standing to prosecute SMP's derivative and their direct claims as pled.

---

[176] *Id.*

[177] Compl. ¶ 4.

[178] Plaintiffs also bring direct breach of contract and fraud claims that could not have been sold under the Sale Order. *See NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015) (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (holding that *Tooley* "has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights"); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015)

## 2. Breach of Contract/Implied Covenant (Counts 2, 3, 5, 13 and 14)

Plaintiffs bring the following breach of contract claims:

- Count 2 alleges DXS and Noronha breached their confidentiality obligations under the SMP Agreement;[179]

- Count 5 alleges DXS and PacNet breached the SMP Agreement when the Lippo Group acquired the Noble Loan without approval from SMP's Board;[180] and

- Count 13 alleges Noble breached the NLA when it sold the Noble Loan to the Lippo Group.[181]

Relatedly, Plaintiffs assert the following breaches of the implied covenant:

- Count 3 alleges DXS and PacNet breached the implied covenant by exercising the Blocking Rights in bad faith;[182] and

- Count 14 alleges Noble breached the implied covenant by not notifying Plaintiffs that Noble was planning to sell the Noble Loan until it was too late.[183]

Under Delaware law, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and

---

("[F]raud in connection with the purchase or sale of shares" is a "[q]uintessential example[] of [a] personal claim.").

[179] Compl. ¶¶ 139–45.

[180] Compl. ¶¶ 155–62.

[181] Compl. ¶¶ 205–11.

[182] I address Count 3 in Section II.B.3.b (below).

[183] Compl. ¶¶ 212–17.

(3) a resulting damage to the plaintiff."[184]  When addressing whether a plaintiff has well pled the first two elements, the court must consider, and often construe, the proffered contract at the heart of the claim of breach.  The construction of a contract is a question of law, and Defendants have no right to dismissal under Rule 12(b)(6) unless "the interpretation of the contract on which their theory of the case rests is the only reasonable construction as a matter of law."[185]  On the other hand, if there is more than one "reasonable construction" of contractual language, then the contract is ambiguous, and Defendants' Motions to Dismiss cannot be granted.[186]  Of course, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[187]  Instead, the court will apply standard canons of contract interpretation in construing the contract to ascertain whether the contract is ambiguous.[188]

---

[184] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[185] *CSH Theatres, LLC v. Nederlander of San Francisco Assoc.*, 2015 WL 1839684, at *8 (Del. Ch. Apr. 21, 2015).

[186] *Id.*, at *8.

[187] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[188] *CSH Theatres*, 2015 WL 1839684, at *8.

### a. DXS and Noronha's Confidentiality Obligations (Count 2)

In Count 2, Plaintiffs allege DXS and Noronha breached Section 5.1(l)(ii) of the SMP Agreement.[189] Section 5.1(l)(i) grants DXS and Noronha observation rights on the SMP Board.[190] But Section 5.1(l)(ii) conditions those rights on DXS and Noronha's promise to "hold in confidence and trust all information" they learned "in connection with [their] rights under [the SMP Agreement.]"[191]

According to Plaintiffs, Noronha and DXS breached Section 5.1(l)(ii) in two steps.[192] *First*, they used their observation rights to learn about the significant inherent value of CSM's "world class" assets.[193] *Second*, Noronha and DXS "leaked their knowledge, in breach of the SMP Agreement, to non-SMP members."[194] The non-SMP members (Waterloo, Stephen and Michael Riady and LCR), in turn, were "positioned" to value and later acquire the Noble Loan based on confidential information and then exploit the Noble Loan to harm SMP.[195]

---

[189] Compl. ¶¶ 139–45.

[190] SMP Agreement § 5.1(l)(i).

[191] SMP Agreement § 5.1(l)(ii).

[192] PAB at 90–91.

[193] *Id.* at 90 (citing Compl. ¶¶ 70, 71); SMP Agreement § 5.1(l)(ii).

[194] PAB at 90–91 (citing Compl. ¶¶ 84, 142, 144).

[195] *Id.* at 91 (citing Compl. ¶¶ 10, 84, 114, 126).

Lippo counters that Plaintiffs have not well pled "what" confidential information DXS and Noronha wrongfully discovered, "how or when" they obtained such information or "to whom" they wrongfully leaked the information.[196] I disagree. While Count 2 is not a paragon of specificity, it adequately provides "general notice of the claim asserted."[197]

Reading the Complaint holistically, Plaintiffs have well pled the following facts:

- The Lippo Group "secretly hatched a plan" to "depress the value of SMP and its assets" and then take those assets for itself—to SMP's detriment.[198]

- Stephen Riady is LCR's Chairman—one of the key entities in the Lippo Group.[199]

---

[196] DOB at 47–48 (citing *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *3 (Del. Super. Ct. Apr. 24, 2001) (dismissing a *trade secret misappropriation claim* in part because plaintiff failed to allege what information was misappropriated)). Lippo's citation to *Savor* is inapt since that case reviewed a claim under the Uniform Trade Secrets Act. *Savor*, 2001 WL 541484, at *3. There, the court rightly reviewed whether the complaint had well pled the defendant had "misappropriated" a "trade secret"—which required an analysis of multiple statutory elements and definitions. *Id.* In this case, the question is simply whether Plaintiffs have pled facts supporting a reasonable inference that DXS and Noronha shared confidential information in breach of the SMP Agreement. *See UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *10 (Del. Ch. Sept. 17, 2015).

[197] *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998); *see also McDonald v. Baldy*, 2014 WL 7009715, at *1 (Del. Com. Pl. Nov. 25, 2014) (To survive a motion to dismiss, a breach of contract claim need only "plead enough facts to plausibly suggest" that the plaintiff will ultimately be entitled to relief.) (internal quotation omitted).

[198] Compl. ¶ 8.

[199] Compl. ¶ 128(c).

45

- Besides his role as DXS's "representative" on the SMP Board, Noronha was hired by, reports to and worked for Stephen Riady while also "representing" Waterloo.[200]

- Noronha and Cooper kept Michael Riady "regularly informed" of the Lippo Group's investment in SMP.[201]

- As a member of the Board, Cooper learned, on a confidential basis outside of a Board meeting, that CSM's assets were worth at least $600 million. Rather than share that information with the Board, he secretly told DXS and PacNet about the valuation.[202]

- Cooper and Noronha would negotiate with SMI and CC on behalf of the broader Lippo Group.[203]

- The Cooper/Noronha Email uses the pronoun "we" to include Noronha, Cooper and the Riady family while also discussing the Lippo Group's larger plan to tank SMP and scoop up its assets.[204]

- LCR's subsidiary, Waterloo (which Noronha represents), eventually acquired the Noble Loan, over SMI and CC's objections, as the penultimate step in the Lippo Group's plan to harm SMP.[205]

In light of these allegations, I find it reasonably conceivable that Noronha and DXS used their rights under the SMP Agreement to learn the true value of CSM's

---

[200] Compl. ¶¶ 123, 128(n).

[201] Compl. ¶ 128(d); *see also* Compl. ¶ 143 ("Noronha revealed confidential information that he obtained in his capacity as DXS Representative to Waterloo.").

[202] Compl. ¶¶ 10, 71.

[203] Compl. ¶ 78.

[204] Compl. ¶ 80.

[205] Compl. ¶¶ 30, 108, 111, 123, 128(q).

assets, and then shared that information with LCR and its managers in breach of Section 5.1(l)(ii). The Cooper/Noronha Email, specifically, supports a reasonable inference that Noronha was actively trying to advance the Lippo Group's interest at SMP's expense.[206] Given Noronha's access to SMP's confidential information and his allegiance to the Lippo Group, as alleged, it is reasonable to infer he breached his confidentiality obligations. Defendants' Motions to Dismiss Count 2 must be denied.

### b. Breach of Section 3.5 Relating to SMP Member Loans (Count 5)

In Count 5, Plaintiffs allege DXS and PacNet breached Section 3.5 of the SMP Agreement when Waterloo acquired the Noble Loan.[207] Section 3.5 provides: "the [Board] is authorized to cause [SMP] to [borrow funds from members]."[208] In the event a member makes a loan to SMP, "each Member [is] entitled . . . to make its *pro rata* share . . . of any such loans."[209]

Plaintiffs and Lippo proffer dueling interpretations of Section 3.5. While not entirely clear, Plaintiffs seem to argue Section 3.5 prohibits SMP's members and any member's affiliate from "possess[ing]" any loan made to SMP or CSM absent

---

[206] Compl. ¶ 80.

[207] Compl. ¶¶ 155–62.

[208] SMP Agreement § 3.5.

[209] SMP Agreement § 3.5.

SMP Board approval.[210]  In contrast, Lippo argues Section 3.5 requires SMP Board approval only when a member makes a loan *to SMP*.[211]  Lippo offers the only reasonable interpretation of Section 3.5.

Section 3.5's plain meaning speaks only of "*the Company*" (i.e., SMP) "borrowing funds *from Members*" and members' rights to participate when "any *Member* is making any such loan *to [SMP]*."[212]  Other provisions in the SMP Agreement reveal that the SMP Agreement's drafters knew how to prohibit loans at the CSM level, but they did not include parallel language in Section 3.5.[213] Plaintiffs' construction stretches the SMP Agreement's plain language beyond reason and cannot support its claims of breach related to Section 3.5.[214]  Count 5 must be dismissed.

---

[210] Compl. ¶ 158; PAB at 88–89.

[211] DOB at 46 (I do not address Lippo's other arguments).

[212] SMP Agreement § 3.5 (emphasis supplied).

[213] *See, e.g.*, SMP Agreement § 4.6(b)(i)(7), (17) (The Company "shall not . . . cause or permit any Subsidiary to undertake any action in the nature of the foregoing" including "grant[ing] or pledg[ing] of any security interest."); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360, 364 (Del. 2013) (interpreting a contract according to its "plain meaning" when read "as a whole" and declining to infer that the challenged language resulted from "sloppy drafting" when the agreement's drafters "knew how to impose an affirmative obligation when they so intended").

[214] Compl. ¶¶ 9, 31.

### c. Breach of the NLA (Count 13 and 14)

In Counts 13 and 14, Plaintiffs assert derivative claims on behalf of SMP against Noble for breach of the NLA.[215] Specifically, Plaintiffs allege Noble breached the NLA when it agreed to sell the Noble Loan to Waterloo without "prior notice" or "approval."[216] Count 14 alleges Noble breached the NLA's implied covenant by "concealing its agreement to sell the Noble Loan to Waterloo until the day before it was effectuated, thereby . . . depriving SMP . . . of the benefit of the notice requirement in Section 9.07(b) of the [NLA]."[217] New York substantive law governs the NLA.[218]

As for Count 13, Plaintiffs' theory of breach rests on at least two key axioms. *First*, Plaintiffs argue the Fourth Amendment, which deleted the Insider Sale Prohibition, was void because it was procured by fraudulent means.[219] If true, this

---

[215] Compl. ¶¶ 205–17.

[216] Compl. ¶ 210.

[217] Compl. ¶ 216.

[218] NLA § 9.15(a). New York and Delaware share many, if not most, of the same principles of substantive contract law. *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 90 (Del. Ch. 2009). Like Delaware, New York requires the plaintiff alleging breach of contract to prove: "(1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage." *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 872 (N.Y. Sup. Ct. 2015).

[219] Compl. ¶ 209.

would leave the Insider Sale Prohibition intact.[220]  Plaintiffs argue Noble violated the Insider Sale Prohibition when it sold the Noble Loan to Waterloo.[221]  *Second*, Plaintiffs assert SMP has standing to enforce the NLA (and its Insider Sale Prohibition) either (i) as a party or (ii) as an intended third-party beneficiary.[222]  As I explain below, even assuming Plaintiffs' first axiom is solid, their breach of contract claim against Noble still fails because they lack standing to enforce the NLA.  Because Plaintiffs cannot enforce the NLA, their implied covenant claim in Count 14 also fails.[223]  Counts 13 and 14 must be dismissed.

### i. SMP Has No Direct Party Standing Under the NLA

To have standing to enforce a contract, a plaintiff must be a contract party, assignee or an intended third-party beneficiary.[224]  As Noble correctly observes, the

---

[220] Compl. ¶ 92.

[221] Compl. ¶ 210.

[222] Compl. ¶ 206.

[223] *511 W. 232 Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. Ct. App. 2002) (The implied covenant "embraces a pledge that *neither party* shall do anything which will have the effect of destroying or injuring the right of *the other party* to receive the fruits of the contract.") (emphasis supplied) (internal quotation omitted).  Because I find Plaintiffs lacked standing to bring Count 14, I do not consider whether they have otherwise well pled a breach of the implied covenant under Rule 12(b)(6).

[224] *Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.*, 304 A.D.2d 86, 90 (N.Y. Ct. App. 2003).

50

NLA unambiguously states that the only parties to the NLA are CSM and Noble.[225] Even so, Plaintiffs argue the definition of "Loan Party" in the NLA somehow contradicts the contract's clear identification of the parties and thus creates an ambiguity regarding who, exactly, are the parties to the contract.[226] As in all questions of contract interpretation, the "parties' intent" guides the court's determination of standing under the NLA.[227] And "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."[228]

Plaintiffs correctly observe that the NLA mentions SMP in its definition of Loan Parties and contains a cross-default provision related to the Intercreditor Agreement to which SMP *was* a party.[229] These references reflect that the NLA was a component of a larger financing arrangement between a lender and an operating subsidiary for which a parent provided collateral support.[230] That is a far cry, however, from reflecting an intent by the actual parties to the NLA to include SMP

---

[225] NLA at CSMining0033526 (recitals); NOB at 27.

[226] NOB at 27–31; PAB at 96–101.

[227] *Buchovecky v. S & J Morrell, Inc.*, 175 A.D.3d 945, 946 (N.Y. Sup. Ct. App. Div. 2019).

[228] *Id.*

[229] PAB at 96–97; NLA §§ 9.12 (referencing "Loan Documents") 1.01 (definitions of "Loan Party" and "Loan Documents").

[230] Compl. ¶¶ 55–56.

as an additional party to whom rights and obligations under the NLA would directly flow.

Plaintiffs cite *This Is Me, Inc. v. Taylor*, for the sweeping proposition that "each party to [an] integrated transaction has standing to enforce the transaction's constituent documents."[231] The premise appears to be that a party to one contract among a suite of related contracts has direct party standing to enforce other contracts within the suite to which it is not a party. The United States District Court for the Southern District of New York has squarely rejected such a broad reading of *This Is Me*, writing, "[t]he mere fact that a document is an 'integral part' of a larger transaction does not mean that any provision contained in that document must be applied to all other documents."[232] The court then made clear:

> [E]ven though several instruments relating to the same subject and executed at the same time should be considered in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute *one contract* or that *one contract was accordingly merged in or unified with another* so that every provision in one becomes a part of every other.[233]

With respect to who are, and who are not, parties to the NLA, Noble offers the only reasonable construction of the contract. On its face, the NLA makes clear

---

[231] PAB at 96 (citing 157 F.3d 139, 143 (2d Cir. 1998)).

[232] *See Rosen v. Mega Bloks Inc.*, 2007 WL 1958968, at *4–5 (S.D.N.Y. July 6, 2007).

[233] *Id.*, at *5 (citing 11 WILLISTON ON CONTRACTS § 30:26 (4th ed.)) (emphasis supplied).

that the "parties" to the contract are CSM and Noble.[234] For example: (i) the NLA's cover page lists only CSM and Noble;[235] (ii) the NLA's recitals describe the agreement as one "entered into . . . by and between [CSM] . . . (the 'Borrower') and Noble . . . (the 'Lender')";[236] (iii) in Article II, titled "THE COMMITMENT AND LOANS," Noble was obligated to "make loans" to CSM while CSM had a corresponding obligation to "repay" Noble;[237] and (iv) the NLA's signature page was "executed" by "the parties hereto" and signed by only CSM and Noble.[238]

Even though the NLA was a part of a larger relationship between Noble, CSM and SMP, I must give effect to the parties' choice to structure the NLA as an agreement "between" CSM and Noble.[239] If a parent entity wishes to provide security for a subsidiary's loan, it can either (i) become a party to the subsidiary's loan agreement and promise to repay the subsidiary's debt, or (ii) form a separate

---

[234] NLA at CSMining0033526 (recitals).

[235] NLA at CSMining0033522.

[236] NLA at CSMining0033526 (recitals).

[237] NLA §§ 2.01, 2.06.

[238] NLA at CSMining0033580–81.

[239] NLA at CSMining0033526 (recitals).

53

guarantee agreement with the subsidiary's lender.[240] SMP chose the latter, so it is not a party to the NLA.[241]

## ii. SMP Has No Third-Party Beneficiary Standing Under the NLA

Even if SMP is not a party to the NLA, Plaintiffs contend SMP has standing to enforce the NLA as its intended third-party beneficiary.[242] To demonstrate SMP enjoys third-party beneficiary status, Plaintiffs must plead facts that allow a reasonable inference that (i) the NLA "was intended for [SMP]'s benefit" and (ii) "the benefit to [SMP] is sufficiently immediate, rather than incidental."[243] "Mere intent to confer third-party rights is insufficient; there must be a benefit that is

---

[240] *Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 276 A.D.2d 341, 343 (N.Y. Sup. Ct. App. Div. 2000) ("A guarantee is an agreement to pay a debt owed by another which creates a secondary liability and thus is collateral to the contractual obligation. The principal debtor is *not* a party to the guarantee and the guarantor is *not* a party to the principal obligation.").

[241] *Id.* (SMP's rights and obligations as a guarantor are "distinct.").

[242] PAB at 98.

[243] *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 274 (S.D.N.Y. 2009); *Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 426 (N.Y. App. Div. 1983) ("An incidental beneficiary is a third party who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered.").

explicit and direct."[244]  In this regard, "a benefit received through corporate ownership is insufficient to establish rights as a third-party beneficiary."[245]

Predictably, the parties proffer conflicting interpretations of the NLA with respect to its conferral of third-party beneficiary status upon SMP. Plaintiffs argue Section 9.07 of the NLA evinces an intent to confer a "clear" and "direct" benefit upon SMP.[246]  Noble disagrees. By Noble's lights, Plaintiffs have not identified "an independent duty [that] run[s] from [Noble] to [SMP] that bears on the claims."[247]  In my view, Noble, once again, has offered the only reasonable construction of the NLA.

Plaintiffs' proffered contract construction cannot be squared with the NLA's plain language. Section 9.07(a) states, "nothing in this Agreement, express or implied, shall be construed to confer upon any Person (other than the parties

---

[244] *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 337–38 (S.D.N.Y. 2005); *Del Norte v. WorldBusiness Capital, Inc.*, 2017 WL 4334005, at *12 (S.D.N.Y. Apr. 5, 2017) ("Even when the contracting parties specifically intend to confer benefits on a third party, not all consequential damages which flow from a breach of the contract are recoverable by the third party. The contract must evince a discernible intent to allow recovery for the specific damages to the third party that result from a breach thereof before a cause of action is stated.").

[245] *Solutia*, 385 F. Supp. 2d at 338; *United Int'l  Hldgs., Inc. v. Wharf (Hldgs.) Ltd.*, 988 F. Supp. 367, 372 (S.D.N.Y. 1997) (To be a third-party beneficiary of a contract with its subsidiary, a parent must establish a benefit "beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries.").

[246] PAB at 100.

[247] NOB at 31 (quoting *Solutia*, 385 F. Supp. 2d at 338).

55

hereto,[)] . . . any legal or equitable right."[248]  New York law, like Delaware's, is clear that "[t]he best evidence of the intent to bestow a benefit upon a third party is the language of the contract itself," and a court will be reluctant to find third-party beneficiary status when, as here, "a provision of the agreement expressly negates enforcement by third parties."[249]

Staggering, but undeterred, Plaintiffs clinch on to the Intercreditor Agreement in search of a mutual statement of intent by Noble and CSM to confer third-party beneficiary status upon SMP.[250]  That agreement, in its recitals, states, "*[SMP] anticipates* to benefit directly from the [NLA]."[251]  Even if it were appropriate to look beyond the NLA to establish an intent to benefit SMP with the NLA, a dubious proposition of New York law, a unilateral statement that SMP "anticipates" benefits from the NLA cannot reflect a mutual intent to provide third-party benefits under the NLA.  *Both* parties to a contract must "specifically intend to confer benefits on a third party" to create third-party beneficiary status.[252]  SMP's unilateral, extra-

---

[248] NLA § 9.07(a).

[249] *767 Third Ave. LLC v. Orix Capital Mkts., LLC*, 26 A.D.3d 216, 218 (N.Y. Sup. Ct. App. Div. 2006); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 485 N.E.2d 208, 212 (N.Y. Ct. App. 1985) (To confer third-party beneficiary status, a contract must "clearly evidence[] an intent to permit enforcement by the third party.").

[250] PAB at 99.

[251] *Id.* (citing NOB at Ex. C (the Intercreditor Agreement)).

[252] *Strauss*, 98 A.D.2d at 427.

contractual statement that it "anticipates" benefits is hardly an expression of mutual intent.

Plaintiffs also fail to identify a direct benefit to SMP in the NLA. "Mere intent to confer third-party rights is insufficient; there must be a benefit that is explicit and direct."[253] By its own terms, Section 9.07 contains no "independent duty [that] run[s] from [Noble] to [SMP] that bears on the claims."[254] Instead, Section 9.07 contains two relevant promises that Noble made *to CSM*. *First*, Noble promised CSM not to assign or transfer the Noble Loan to a member of the Lippo Group.[255] *Second*, Noble promised to give CSM "prior notice" before assigning the Noble Loan.[256] On their face, these are obligations Noble owed *to CSM*.[257] Any benefit SMP received from

---

[253] *Solutia*, 385 F. Supp. 2d at 337.

[254] *Id.* In their Answering Brief, Plaintiffs vaguely reference certain duties Noble owed to SMP under the NLA. Specifically, Plaintiffs reference duties "in connection with loan documentation, amending other related contracts (*e.g.*, the "Skye Credit Agreement" to which SMP was a party), events of default, amendments to the [NLA], and confidentiality." PAB at 99. But a vague reference to these unrelated rights has nothing to do with the specific provision SMP now seeks to enforce. *See, e.g.*, *Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, 2010 WL 4739938, at *9 (S.D.N.Y. Nov. 5, 2010) (holding a parent lacked standing to enforce its subsidiary's rights when its subsidiary signed a contract that "expressly [made] reference to" the parent, but the specific provision the parent sought to enforce (related to employment obligations) "makes no reference to [the parent]").

[255] NLA § 9.07(a).

[256] NLA § 9.07(b).

[257] It is appropriate to observe here that Plaintiffs cannot have it both ways—they have emphasized they are asserting derivative claims only on behalf of SMP, not CSM, in order to avoid the preclusive effect of the Sale Order. They cannot attempt to have SMP slide

57

these provisions is an indirect result of its investment in CSM and is, therefore, insufficient to confer third-party beneficiary status upon SMP.[258] Of course, SMP could have caused CSM to bargain for SMP's third-party beneficiary rights. For example, SMP could have caused CSM to bargain for notice or approval rights for SMP before Noble could sell or assign the Noble Loan. But, again, it bargained for no such thing.

\* \* \* \* \*

SMP is neither a party to the NLA nor a third-party beneficiary of that contract. Thus, it lacks standing to enforce the NLA, and Count 13 must be dismissed.

This holding has two consequences. *First*, because Plaintiffs lack standing to enforce the NLA, Plaintiffs' Count 14, alleging breach of the NLA's implied covenant, must also be dismissed.[259] *Second*, because Plaintiffs have failed to allege

---

back into CSM's shoes to assert claims under the NLA with a weak assertion of third-party beneficiary status.

[258] *United Int'l Hldgs.*, 988 F. Supp. at 372 ("[Plaintiff] has not established that receipt of the payments provided a direct benefit to the [parent] beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries, and this indirect benefit is insufficient to establish third-party beneficiary status.").

[259] *See OptimisCorp. v. Waite*, 2015 WL 5147038, at \*76 (Del. Ch. Aug. 26, 2015) ("Only parties to an agreement can assert a claim for breach of the implied covenant.").

an underlying breach of the NLA, Plaintiffs' Count 12, alleging tortious interference

with the NLA, must also be dismissed.[260]

### 3. Breach of Fiduciary Duty Claims (Counts 6–8)

Three Counts in the Complaint assert breach of fiduciary duty claims:

- Count 6 alleges Cooper breached his contractual and common law fiduciary duties and that Cooper's breaches are attributable to Noronha, Michael Riady, Stephen Riady and LCR as Cooper's principals.[261]

- Count 7 alleges DXS and PacNet owed fiduciary duties because they exercised "actual control" over SMP, and further alleges these breaches are attributable to Noronha, Michael Riady, Stephen Riady and LCR as DXS and PacNet's principals.[262]

- Count 8 alleges Michael Riady, Stephen Riady and LCR owed fiduciary duties as SMP's controllers.[263]

SMP is a Delaware LLC and, as such, the Delaware Limited Liability

Company Act permits its members to "expand or restrict" the "member's or

manager's . . . duties."[264]   Given the centrality of the operating agreement in

---

[260] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *37 (Del. Ch. Sept. 30, 2013) (One of the elements of a claim for tortious interference with a contract is a viable claim for "a breach of [] contract.").

[261] Compl. ¶¶ 163–69.

[262] Compl. ¶¶ 170–76.

[263] Compl. ¶¶ 177–82.

[264] 6 *Del. C.* §§ 18-1101(c), 18-1104; *CHS Theatres*, 2015 WL 1839684, at *11; *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006).

governance disputes involving alternative entities, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship."[265]   And, because a LLC agreement is a contract, its interpretation is generally subject to ordinary contract law principles.[266]

Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty.[267]   "Although fiduciary duties may be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive."[268]   Thus, this court has consistently found that removal of default fiduciary duties through an LLC agreement must be clear and unambiguous.[269]

With these basic principles in mind, the first step in my analysis of each of the fiduciary duty claims is to construe the terms of the SMP Agreement against the

---

[265] *Douzinas*, 888 A.2d at 1149–50.

[266] *Domain Assocs., L.L.C. v. Saha*, 2018 WL 3853531, at *18 (Del. Ch. Aug. 13, 2018).

[267] 6 *Del. C.* § 18-1104; *CHS Theatres*, 2015 WL 1839684, at *11.

[268] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014).

[269] *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) (citing *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012)).

backdrop of the applicable default rules to discern (i) which, if any, of the Defendants owe fiduciary duties, (ii) the scope of those fiduciary duties and (iii) whether the Complaint well pleads a breach of those duties.

### a. Count 6

In Count 6, Plaintiffs allege Cooper owed SMP and its members fiduciary duties of care, loyalty and candor as a manager of SMP.[270] Plaintiffs also claim Cooper breached those duties when he used his position to leak confidential information and help the Lippo Group cut off SMP from capital in furtherance of its scheme to acquire the Noble Loan and ultimately CSM's assets.[271] According to Plaintiffs, because Cooper was acting as an agent for Noronha, Michael Riady, Stephen Riady and LCR (the "Count 6 Defendants") when he breached his duties, these Lippo Group members are also liable for his fiduciary breaches.[272]

The parties draw the battle lines regarding Count 6 around the scope of Cooper's fiduciary duties.[273] Lippo seizes on Section 5.1(h), which allows SMP's managers to "engage in whatever activities such Manager or its Affiliates may

---

[270] Compl. ¶ 164.

[271] Compl ¶¶ 163–69.

[272] Compl ¶ 168.

[273] PAB at 42; DOB at 35.

choose" without having an obligation to share opportunities with SMP.[274] According to Lippo, because SMP's managers need not share corporate opportunities with the Company, "[t]he Noble Loan was not a corporate opportunity that needed to be presented to SMP."[275] Thus, Cooper's efforts to help the Lippo Group acquire the Noble Loan could not be a breach of fiduciary duty.[276]

Plaintiffs' riposte rests on Sections 5.1(f) and (g), which provide that SMP's managers are not exempt from liability any more than would be "permitted by the [DGCL]," and emphasize that "a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders."[277] According to Plaintiffs, these provisions clearly express the parties' intent to hold SMP's managers to the same fiduciary duties they would owe if they were directors of a Delaware corporation.[278]

After carefully reviewing the SMP Agreement, I am satisfied that it unambiguously holds SMP's managers to contractual fiduciary duties that are the same as common law fiduciary duties in all regards, except with respect to corporate

---

[274] DRB at 19; SMP Agreement § 5.1(h).

[275] DRB at 20.

[276] *Id.*

[277] SMP Agreement §§ 5.1(f), (g).

[278] PAB at 47–48.

opportunities.[279] When viewed through this lens, Lippo's arguments that Plaintiffs have failed to state viable breach of fiduciary duty claims, at least as against some members of the Lippo Group, miss the mark.

Considering the Complaint as a whole, Cooper allegedly:

- learned CSM's assets were worth $600 million through his role as a SMP Board member and shared that information with the Lippo Group while concealing it from SMP's other Board members;[280]

- filed a lawsuit along with DXS and PacNet seeking to cut off SMP from capital in order to harm SMP and increase the Lippo Group's leverage;[281]

- lied to SMP's other Board members when they asked whether he was involved in any discussions regarding purchasing the Noble Loan;[282]

- refused to attend SMP Board meetings to prevent SMP from responding to the liquidity crisis;[283] and

- used his position on the Board to engage in the Unauthorized Acts—harming SMP and benefitting the Lippo Group.[284]

---

[279] *See CelestialRX*, 2017 WL 416990, at *17–18 (interpreting similar language to "eschew[] the corporate opportunity doctrine"); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (observing that under Delaware law, courts "interpret clear and unambiguous contract terms according to their plain meaning").

[280] Compl. ¶¶ 70–71.

[281] Compl. ¶ 64.

[282] Compl. ¶ 104.

[283] Compl. ¶¶ 81, 85.

[284] Compl. ¶¶ 121–22.

Lurking behind each of these allegations is the Cooper/Noronha Email where Cooper, referring to himself, Noronha and the Riady family stated, ". . . then we can sit back and hold our position and when this [i.e., CSM] collapses we have the first lien and can buy it out of bankruptcy very cheap."[285]

In sum, Plaintiffs have pled facts supporting a reasonable inference that Cooper used his status as a SMP fiduciary to harm SMP and benefit the Lippo Group.[286] When a fiduciary, in his own words, intentionally "sit[s] back" while his company "collapses" so that another to whom he is beholden can buy the company's assets "out of bankruptcy very cheap," it is reasonably conceivable that he has breached the fiduciary duty of loyalty.[287] It is also reasonably conceivable that his breach exceeds the scope of behavior the corporate opportunity doctrine prohibits such that the contractual corporate opportunity carve-out does not bar the claim.[288]

---

[285] Compl. ¶ 80.

[286] Compl. ¶¶ 64, 70–71, 80–81, 85, 104, 121–22.

[287] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."); *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("If the drafters [of an LLC agreement] have opted for manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law.").

[288] *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996) ("The corporate opportunity doctrine . . . holds that a [fiduciary] may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest

Even if Cooper was not obliged to "share" the Noble Loan with Plaintiffs, that allowance did not give him license to harm SMP by conspiring to drive CSM into bankruptcy through the acquisition of the Noble Loan or otherwise.[289] As a result, Lippo's Motions to Dismiss Count 6 against Cooper must be denied.[290]

Having found that Plaintiffs have well pled Count 6 against Cooper, I must address Plaintiffs' theory that Cooper breached his fiduciary duties as an agent for the Count 6 Defendants such that those defendants are also answerable for Cooper's breach(es).[291] To establish a principal's liability for the acts of his agent, a plaintiff must allege facts supporting a reasonable inference that a principal-agent

---

or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."); *see also Feeley*, 62 A.3d at 664 (If they seek to eliminate fiduciary duties, an LLC agreement's drafters "must make their intent . . . plain and unambiguous.").

[289] *See, e.g.*, Compl. ¶¶ 121–22 (Cooper allegedly took specific actions as a SMP manager to help the Lippo Group "divest SMP of its interest" in CSM.).

[290] Lippo misplaces its arguments that Plaintiffs' allegations "have nothing to do with Cooper's role as SMP's Manager" and that "Cooper had no ability to control the Board." *See* DOB at 35. *First*, a fiduciary cannot simply "change hats" and thereby shed himself of fiduciary obligations. *See Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ("There is no dilution of [fiduciary] obligation[s] where one holds dual or multiple directorships."); *Emerald P'rs v. Berlin*, 787 A.2d 85, 90 (Del. 2001) ("[F]iduciary responsibilities do not operate intermittently."). *Second*, while Cooper's ability to control a majority of the Board might be relevant at times, such as when undertaking a demand futility analysis under Court of Chancery Rule 23.1, it does not change whether Cooper owed fiduciary duties in the first instance or whether it is reasonably conceivable that he breached those duties.

[291] Compl. ¶ 168 ("[A]t all relevant times, Cooper was an agent of Noronha, Michael Riady, Stephen Riady, and LCR, who acted on their behalves and at their direction in pursuing the interests of the Lippo Group.").

relationship existed.[292]  "An agency relationship, as a matter of law, is a fiduciary relationship . . . that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."[293]

Lippo argues Plaintiffs have failed to allege that the Count 6 Defendants "consented to have [Cooper] act on [their] behalf."[294]  Plaintiffs counter that they deserve a "reasonable inference" that "Noronha, the Riadys, and LCR consented to

---

[292] *See, e.g.*, *Baccellieri v. HDM Furniture Indus., Inc.*, 2013 WL 1088338, at *3–4 (Del. Super. Ct. Feb. 28, 2013), *aff'd*, 74 A.3d 653 (Del. 2013) (reviewing whether plaintiffs had adequately alleged facts supporting an inference that a principal-agent relationship existed).

[293] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *20 (Del. Ch. Nov. 17, 2014) (internal quotation omitted).  "There are three distinct bases on which the common law of agency attributes the legal consequences of one person's action to another person: actual authority, apparent authority, and respondeat superior." *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *17 n.102 (Del. Ch. Aug. 28, 2012) (citing RESTATEMENT (THIRD) OF AGENCY ch. 2, intro. note (2006)) (internal quotation omitted).  While not entirely clear, in their Answering Brief, Plaintiffs appear to argue Cooper acted with the Count 6 Defendants' *actual authority* when he breached his fiduciary duties.  *See* PAB at 64 ("Under Delaware law, a principal is liable for the torts of his agent when the agent acts with the principal's *actual authority*, *i.e.*, that authority which a principal expressly or implicitly grants to an agent.") (emphasis supplied) (internal quotation omitted).  "Actual authority, then, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *16 (Del. Ch. Dec. 8, 2017) (internal quotation omitted). Ultimately, for the reasons I explain below, it makes no difference whether one analyzes Plaintiffs' claims under actual authority, apparent authority or respondeat superior.

[294] DOB at 40.

Cooper, DXS, and PacNet acting on their behalves where . . . these defendants directed and controlled Cooper, DXS, and PacNet in connection with the conduct at issue."[295]

The problem with Plaintiffs' principal-agent theory is that it misconstrues the fundamentals of agency law. A defining feature of the principal-agent relationship is the principal's *right to control* the agent's conduct.[296] Plaintiffs have not well pled that the Count 6 Defendants had any right to force Cooper to take the actions that allegedly comprise his breach of fiduciary duties. Instead, what Plaintiffs have alleged is that Cooper breached his fiduciary duties when he exercised *his own* rights and obligations as a SMP Board member.[297] Cooper derived these rights from Section 5.1 of the SMP Agreement—not from any alleged principal-agency relationship.[298]

---

[295] PAB at 64.

[296] 3 AM. JUR. 2D AGENCY § 18 ("Fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him or her."); RESTATEMENT (THIRD) OF AGENCY § 1.01(c) ("An agent who has actual authority holds power as a result of a voluntary conferral by the principal and is privileged, in relation to the principal, to exercise that power.").

[297] *See, e.g.*, Compl. ¶¶ 60 ("Cooper refused to sign a January 15, 2015, written consent [Board] action.").

[298] SMP Agreement §§ 4.5 ("[T]he day-to-day management of the Company is vested in the [Board]. The Members shall have no power, as Members, to participate in the management of the Company."), 5.1 ("The business and affairs of the Company will be managed and all Company power will be exercised by or under the direction of the [Board]."); PAB at 64.

Plaintiffs ask me to "infer" a principal-agent relationship based on the Count 6 Defendants' ability to "direct[] and control[] Cooper, DXS, and PacNet in connection with the conduct at issue."[299] But "effective power to control" is not enough to establish a principal-agent relationship.[300] Indeed, "[e]ven when the parent owns all the stock in the subsidiary, [the subsidiary's directors] are not agents of the parent."[301] As our Supreme Court explained in *Weinstein Enterprises, Inc. v. Orloff*:

> The parent, once having elected directors, does not have a right thereafter to intervene. To impose a duty of obedience on directors, moreover, would conflict with the fundamental point that corporate law assigns ultimate managerial power and responsibility to directors. The parent thus lacks the right to assert control through interim instructions, a defining hallmark of a legal relationship of agency. This is not a point of merely formal or definitional significance. As the preceding discussion illustrates, the distinction between a *right* of control and the *effective power* to control often has practical consequences. In the absence of a right to control the directors it elects, the parent must either disregard their existence, a move disrespectful of the corporate paraphernalia that jeopardizes the corporate veil, . . . or the parent must take steps to exercise its power by coercing the directors or removing them, moves that have drawbacks of their own.[302]

---

[299] PAB at 64.

[300] *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 509 (Del. 2005).

[301] *Cochran v. Stifel Fin. Corp.*, 2000 WL 286722, at *17 n.70 (Del. Ch. Mar. 8, 2000), *rev'd on other grounds*, 809 A.2d 555 (Del. 2002).

[302] *Weinstein*, 870 A.2d at 509 (citing Deborah A. DeMott, *The Mechanisms of Control*, 13 CONN. J. OF INT. L. 233, 253 (1999) ("DeMott")). In her thoughtful article, Professor DeMott provides a helpful explanation of the agency relationships created when a parent places directors on a subsidiary's board. Concerning such directors, she writes, "[t]o the extent they serve as the parent's agents, the scope of their agency is limited to the faithful

If a 100% controlling stockholder lacks the requisite rights and authority to establish a principal-agent relationship with the directors of its subsidiary, then, *a fortiori*, the Count 6 Defendants (who held no SMP units) cannot be held liable under a principal-agent theory for Cooper's alleged fiduciary breaches. The Count 6 Defendants' efforts to coerce Cooper may expose them to liability based on other applications of Delaware law, but that liability, if it exists, cannot arise from a principal-agent relationship.

\* \* \* \* \*

For these reasons, Lippo's Motions to Dismiss Count 6 must be denied as to the claims against Cooper, but granted as to the direct claims for breach of fiduciary duty brought against Noronha, Michael Riady, Stephen Riady and LCR.

### b. Counts 7 and 8

In Counts 7 and 8, Plaintiffs bring direct and derivative breach of fiduciary duty claims against DXS, PacNet, Noronha, Michael Riady, Stephen Riady and LCR (the "Alleged Controllers").[303] Plaintiffs argue the Alleged Controllers owed

---

expression of the parent's instructions and, if so instructed, faithful reporting back to the parent. The scope of the agency does *not encompass decisions directors make that implicate the interests of the corporation.* A broader scope is inconsistent with deeply entrenched assumptions about corporate governance." DeMott at 254 (emphasis supplied).

[303] Compl. ¶¶ 163–76.

fiduciary duties to SMP and its members even though they were neither SMP's managers nor holders of a majority of its outstanding membership units.[304]  Indeed, of the Alleged Controllers, only DXS and PacNet held *any* SMP units.[305]  For reasons explained below, I find Plaintiffs have well pled contractual breach of fiduciary duty claims against PacNet and DXS, but not against the other Alleged Controllers.

Because Delaware law recognizes the primacy of contract when addressing governance issues in the alternative entity space, Plaintiffs may not saddle the Alleged Controllers with common law fiduciary duties if doing so would contradict the SMP Agreement's plain language.[306]  On the other hand, if the SMP Agreement does not unambiguously disavow common law fiduciary duties, I must look to

---

[304] Compl. ¶¶ 172, 179.

[305] Compl. ¶ 35.  Three theories animate the allegations in Counts 7 and 8.  *First*, Plaintiffs allege DXS and PacNet exercised actual control over SMP, albeit from a minority position, by virtue of their Blocking Rights.  In turn, this actual control gives DXS and PacNet fiduciary duties, which they breached by starving SMP of capital and "diverting to Waterloo a corporate opportunity belonging to SMP."  Compl. ¶ 173.  *Second*, DXS and PacNet allegedly are "agents" of the remaining Alleged Controllers such that they are liable for DXS and PacNet's alleged breaches of fiduciary duty.  Compl. ¶ 175.  *Third*, Plaintiffs summarily allege Michael Riady, Stephen Riady, and LCR exercised actual control over SMP such that *they* owe fiduciary duties.  *See* Compl. ¶¶ 173, 178.

[306] *See* 6 *Del. C.* §§ 18-1101(c), (e); *Fisk Ventures LLC v. Segal et al.*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008) ("In the context of [LLCs], which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC Agreement or some other contract."); *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) ("When . . . parties . . . cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default.").

70

corporate law principles by analogy when determining whether and to what extent fiduciary duties are owed.[307]

The parties have identified two relevant provisions in the SMP Agreement. *First*, Section 4.3 addresses members' fiduciary duties: "In view of the limited purposes of the Company, no Member nor any of its Affiliates shall have any fiduciary obligations with respect to the Company or to the other Members insofar as making other investment opportunities available to the Company or to the other Members."[308] *Second*, Section 4.6 provides that "except as otherwise specifically provided in this Agreement, all votes, approvals, or consents of a Member may be given or withheld, conditioned or delayed, as such Member may determine in such Member's sole and absolute discretion."[309]

The clear import of both Sections 4.3 and 4.6 is that the SMP Agreement modifies, but does not eliminate, common law fiduciary duties for members.[310]

---

[307] *Obeid*, 2016 WL 3356851, at *6.

[308] SMP Agreement § 4.3. The SMP Agreement defines "Affiliate" to mean "any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, a Member, Manager, or any other entity, as applicable." SMP Agreement § 1.01 (definition of "Affiliate"). Thus, the term "Affiliate" would include all of the Alleged Controllers. *See* Compl. ¶ 6 ("Defendant LCR is an entity that owns and controls DXS and PacNet and, on information and belief, is owned and controlled by the Riady family, and/or its affiliates and controlled parties.").

[309] SMP Agreement § 4.6(a).

[310] *See, e.g.*, *Norton*, 67 A.3d at 361 (discussing agreements in the alternative entity space that "attempt to modify, rather than eliminate, fiduciary duties" and holding that a

71

Section 4.3 unambiguously "eschews the corporate opportunity doctrine."[311]
Section 4.6, however, is more complicated. As noted, that provision affords members the right to "vote, approve or consent," or not, in that member's "sole and absolute discretion."[312] According to the Alleged Controllers, the "sole discretion" language in Section 4.6 is an unambiguous waiver of any "Member-level fiduciary duty."[313] I disagree.

If the SMP Agreement's drafters wished to exempt members from the fiduciary duty of loyalty, they could do so only with express disclaimer language, not "by implication."[314] Plaintiffs have alleged member fiduciaries took a "bad faith action to injure [SMP] for [their] own personal advantage."[315] This allegation implicates the "core aspect of the duty of loyalty," which the "sole discretion"

controller's "sole discretion" approval right was inconsistent with the duties a controlling shareholder would owe under corporate law principles).

[311] *CelestialRX*, 2017 WL 416990, at *18 (interpreting similar language).

[312] *See Norton*, 67 A.3d at 362 (construing similar language).

[313] DOB at 29.

[314] *Miller v. Am. Real Estate P'rs, L.P.*, 2001 WL 1045643, at *7 (Del. Ch. Sept. 6, 2001).

[315] *Id.*, at *11; Compl. ¶¶ 76 ("The Lippo Group . . . use[d] its blocking rights over any financing proposals to hold SMP hostage."), 173 (DXS and PacNet "plac[ed] their own and the Lippo Group's interests, to control and own CSM or its assets, above the interests of SMP."), 180 ("Michael Riady, Stephen Riady, and LCR breached their fiduciary duties to SMP . . . by . . . using DXS's and PacNet's blocking rights to starve SMP of capital.").

language cannot "coyly" eliminate.[316] "To the extent that an Agreement purports to insulate a [fiduciary] from liability even for acts of bad faith . . . it should do so in the most painstakingly clear terms."[317] The day may come when this court must decide whether to enforce express language that "permits a [fiduciary]—by its unmistakable terms—to exercise its discretion in bad faith," but today is not that day.[318]

Having determined the SMP Agreement imposes a contractual governance standard that leaves open the possibility that a member fiduciary breached its common law duty of loyalty by acting in bad faith to injure SMP, the next analytical step is to consider whether it is reasonably conceivable the Alleged Controllers actually were member fiduciaries by virtue of their status as conflicted controlling members. As a general rule, stockholders owe no fiduciary duties to their fellow stockholders.[319] Under Delaware law, however, a stockholder may owe fiduciary duties if he is a "controlling stockholder," a status that is acquired when the stockholder (1) "owns more than 50% of the company's voting power" or (2) "owns

---

[316] *Miller*, 2001 WL 1045643, at *9, *11.

[317] *Id.*, at *11.

[318] *Id.* (noting that such a provision could conflict with Delaware public policy.).

[319] *Basho Tech. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018).

less than 50% of the voting power of the corporation but *exercises control* over the business affairs of the corporation."[320]

Plaintiffs concede the Alleged Controllers held less than 50% of SMP's outstanding membership units.[321] Thus, Plaintiffs must plead facts that allow a reasonable inference that the Alleged Controllers "exercise[d] such formidable voting and managerial power that, as a practical matter, [they were] no differently situated than if [they] had majority voting control."[322]

As pled, it is reasonably conceivable that DXS and PacNet possessed actual control over SMP.[323] Multiple factors can support such a finding, but the focal point of my analysis is DXS and PacNet's Blocking Rights *in context with* the Noble Loan.[324] A reasonable inference can be drawn from the Complaint that the Blocking

---

[320] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (emphasis in original) (internal quotation omitted). A collection of stockholders, acting in concert, may be deemed to exercise a "control block" and, together, may be deemed controlling stockholders even if, alone, that label would not fit. *See Buttonwood Tree Value P'rs, LP v. R.L. Polk & Co., Inc.*, 2017 WL 3172722, at *6 (Del. Ch. July 24, 2017).

[321] Compl. ¶ 35.

[322] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (internal citations and quotations omitted); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[323] *See Basho*, 2018 WL 3326693, at *25 ("If a defendant wields control over a corporation" either "generally or with regard to a particular transaction," then "the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties in that capacity.").

[324] *Id.*, at *26 (noting that a plaintiff can show a minority blockholder's domination and control in various ways including personal relationships with board members, contractual

74

Rights amounted to a self-destruct button which allowed DXS and PacNet to "wield control" by driving SMP into the ground if it suited their interests.[325] Once SMP's operating subsidiary took on the Noble Loan and started Phase II, Plaintiffs deserve an inference that SMP would require imminent, substantial and ongoing capital contributions to fund that all-important project and service that debt.[326] Under these circumstances, it is reasonably conceivable that the Blocking Rights amounted to an on/off switch for SMP that could be, and allegedly was, manipulated by DXS and PacNet to serve their interests at the expense of SMP.

Citing *Basho Technologies v. Georgetown Basho Investors*, Lippo argues that a mere "blocking right standing alone is highly unlikely to support either a finding or a reasonable inference of control."[327] I agree. But Plaintiffs have alleged more. Specifically, they have alleged DXS and PacNet participated in a concerted effort to place SMP in a precarious financial condition (i.e. a conspiracy to harm, as discussed

rights, commercial relationships, de facto ability to remove directors or the company's own characterizations of the minority blockholder's influence).

[325] *Id.*, at *25.

[326] Compl. ¶¶ 49–50.

[327] DRB at 12 (citing *Id.*, at *26 n.315). In *Basho*, this court held it was reasonably conceivable that a minority stockholder owed fiduciary duties when, among other factors, it "used its contractual rights to cut off the Company's access to *other sources* of financing." *Id.*, at *29. Then, when the company was in a "position of maximum financial distress," the company was forced to accept financing from the minority stockholder. *Id.*

below), and then exercised their leverage with the Blocking Rights to steer CSM off the cliff into the bankruptcy ravine below.[328] The Complaint well-pleads that the Blocking Rights allowed DXS and PacNet to block *all* of SMP's efforts to finance *any* of its ongoing operations—with either debt or equity.[329] That, in turn, prompted the Noble Loan default, the Fourth Amendment and the subsequent acquisition of the Noble Loan by Waterloo. When blocking rights empower a minority investor to "channel the corporation into a particular outcome," they contribute to an inference of control.[330] Here, Plaintiffs make an even stronger case as the Blocking Rights did more than "channel" SMP to a particular outcome.[331] Instead, as pled, the Blocking Rights gave DXS and PacNet the unilateral power to shut SMP down—full stop.[332]

Indeed, DXS and PacNet *did* exercise the Blocking Rights to prevent capital contributions by SMI and CC (even at levels of $2.5 million and $3.75 million),

---

[328] Compl. ¶¶ 6, 27, 37, 45–45, 57, 68–69, 85–87, 115–20, 126, 128.

[329] Compl. ¶¶ 44–46, 76; SMP Agreement §§ 4.6(b)(i)(1)–(18).

[330] *Basho*, 2018 WL 3326693, at *29; *see also Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (discussing the difference between "operat[ing] the decision-making machinery of the corporation" (a "classic fiduciary") and "an individual who owns a contractual right, and who exploits that right," forcing a corporation to "react[]" (which does not support a fiduciary status)).

[331] *Basho*, 2018 WL 3326693, at *26.

[332] SMP's sole asset was its investment in CSM, and without access to capital, CSM would fail given its obligations under the Noble Loan and need to complete Phase II. Compl. ¶¶ 9, 48–51, 57–58.

which, predictably, bankrupted SMP's sole asset.[333]    Giving all reasonable inferences to Plaintiffs, I am persuaded the Complaint pleads a reasonably conceivable claim that DXS and PacNet exercised actual control over SMP.  The Complaint also supports a reasonable inference that DXS and PacNet breached their duties by exercising their Blocking Rights in bad faith intending to harm SMP.

As for the remaining Alleged Controllers, however, it is not reasonably conceivable they exercised "actual control" over SMP.[334]  Noronha, Michael Riady, Stephen Riady and LCR owned *no* SMP units, appointed *none* of SMP's Board members and held *no* contractual blocking rights.[335]

Plaintiffs' arguments concerning Noronha, Michael Riady, Stephen Riady and LCR ask me to lash the individual rights of the separate entities and individuals comprising the "Lippo Group" together when assessing the degree of control

---

[333] Compl. ¶ 46.

[334] *Basho*, 2018 WL 3326693, at *26.

[335] *See* Compl. ¶¶ 27 (DXS and PacNet appointed Cooper to the SMP Board.), 35 (The remaining Alleged Controllers held no SMP membership units.); SMP Agreement §§ 1.01 (definition of "Requisite Holders"), 4.6(b)(i) (The Blocking Rights were held by the holders of 75% of SMP's class A units.).  Waterloo held the Noble Loan (which could be considered a lender relationship supporting an inference of control), but Waterloo is not named among the Alleged Controllers.  Compl. ¶¶ 163–76.  As for Noronha, his observation rights gave him no power to control SMP's actions.  *See* SMP Agreement § 5.1(l).

exercised by each non-member.[336]  The Lippo Group is not, itself, a business organization recognized as such under Delaware Law.[337]  In the absence of some legally cognizable association, I must show "respect for corporate separateness," and analyze each *individual* Lippo Group member's control over SMP separately.[338] Through this lens, Plaintiffs' arguments concerning Noronha, Michael and Stephen Riady and LCR fail for two reasons.

*First*, any influence these Alleged Controllers had over Cooper cannot, by itself, support an inference of actual control.[339]  This must be the case because the ability to control Cooper does not amount to influence over a *majority* of SMP's Board.[340]

---

[336] *See, e.g.*, Compl. ¶ 6 ("During the relevant period, the Lippo Group effectively controlled SMP's and (through SMP) [CSM's] operations.").

[337] Compl. ¶ 5 ("The Lippo Group consists of a global network of entities primarily owned and operated by, and primarily for the benefit of, the Riady family.").

[338] *NAMA Hldgs.*, 2014 WL 6436647, at *26.

[339] *See, e.g.*, Compl. ¶¶ 128(f) ("Michael Riady had the ability to fire Cooper."), (h) ("Before making decisions, Cooper would check with 'the family' or the 'group.'").

[340] *Calesa Assocs. L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (finding it was reasonably conceivable that a minority stockholder exercised actual control over a specific transaction when a plaintiff pled facts supporting a reasonable inference that "a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with [the minority stockholder]"); *Thermopylae*, 2016 WL 368170, at *14 ("It is, of course, conceivable that [a minority stockholder] was a fiduciary controller at the time of the re-pricing transaction, assuming it had achieved control or influence over a majority of directors through non-contractual means.").

*Second*, any attempts either to (i) hold these defendants liable as DXS and PacNet's "principals" or (ii) attribute DXS and PacNet's Blocking Rights to the Lippo Group, conflict with fundamental corporate law.[341] As to the former, as explained above, without more, Plaintiffs cannot rely on principal-agent theory to attribute DXS and PacNet's exercise of control to their alleged principals. To the extent DXS and PacNet owed fiduciary duties to SMP and its other members, no person or entity had a *right* to direct their actions as SMP fiduciaries.[342] The lack of such a right undermines a principal-agent relationship for purposes of imputing fiduciary duties to non-fiduciaries.[343] Likewise, Plaintiffs cannot somehow impute the Blocking Rights possessed by DXS and PacNet to other members of the Lippo Group. Put simply, a conclusory statement that someone is a "controller of a controller," without more, does not get Plaintiffs where they want to go.[344] Delaware

---

[341] While *Weinstein* only addressed principal-agent law in context of a principal's relationship to her agent as a member of a board of directors, the same reasoning applies to a controlling stockholder's fiduciary duties. That is, fiduciary responsibilities are "independent" duties. *Weinstein*, 870 A.2d at 509. Once a principal places her agent in a position of fiduciary responsibility, whether as a director or a controlling stockholder, she no longer has the *right* to tell the agent-fiduciary how to make decisions implicating those fiduciary duties. *Id.*

[342] *Weinstein*, 870 A.2d at 509.

[343] 3 AM. JUR. 2D AGENCY § 18 ("Fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him or her.").

[344] *Hospitalists of Del.*, 2012 WL 3679219, at *10. Plaintiffs cite three cases in their Answering Brief for the proposition that "[c]ourts have repeatedly imposed fiduciary duties

79

respects "corporate separateness, which recognizes that because a subsidiary is a separate entity, a parent and its subsidiary are not regarded as a single economic unit."[345] Thus, in the absence of other allegation of "control of the controllers," any control rights DXS and PacNet held as parties to the SMP Agreement belong to DXS and PacNet alone, not to LCR, Noronha or the Riadys.[346]

In summary, the Motions to Dismiss Count 7 are denied as to DXS and PacNet. The Motions to Dismiss Counts 7 and 8 are granted as to Noronha, Michael Riady, Stephen Riady and LCR. By extension, Count 9, which is pled in the alternative to Count 7 against DXS and PacNet, is dismissed. Count 3, alleging DXS

---

on the persons who ultimately control the entity, including those who ultimately control the entities' fiduciaries, such as its managers, board members, general partners, or controlling stockholders." PAB at 62. None of the cases Plaintiffs cite stand for the proposition that a controller of a controller owes fiduciary duties to its indirect subsidiaries based on its ownership interests alone. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002) (holding certain individuals liable for *aiding and abetting* a breach of fiduciary duty); *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019) (involving an individual who both (i) controlled a controlling LLC's member *and* was designated veto rights, in his *individual capacit*y, to veto certain actions); *Virtus*, 2015 WL 580553, at *4, *17–18 (involving an individual who both (i) controlled entities that controlled the corporation at issue *and* (ii) had personal relationships with the corporation's board of directors so that it was not the individual's ownership of a controller, alone, that subjected him to breach of fiduciary duty claims).

[345] *NAMA Hldgs.*, 2014 WL 6436647, at *35.

[346] *See* SMP Agreement § 4.6.

and PacNet exercised their Blocking Rights in breach of the implied covenant, also must be dismissed.[347]

### 4. Aiding and Abetting (Count 10)

In Count 10, Plaintiffs allege aiding and abetting breaches of fiduciary duty against Noronha, Waterloo, Michael Riady, Stephen Riady, LCR and Noble.[348] To state a claim of aiding and abetting, a complaint must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach.[349] I addressed the first two elements in my previous findings that the Complaint states a reasonably conceivable claim of breach of fiduciary duty against Cooper, DXS and PacNet. Defendants do not attack the Complaint's causation allegations. Thus, as is often the case in aiding and abetting litigation, given the Court's finding that Plaintiffs have pled breach claims, the

---

[347] Count 3 alleges DXS and PacNet "exercise[ed] their [B]locking [R]ights under the SMP Agreement" in bad faith by "starving SMP of timely capital." Compl. ¶¶ 147–48. As I have found Plaintiffs have well pled a breach of a *contractual* fiduciary duty based on the same underlying conduct, Count 3 is duplicative of Count 7 and must be dismissed. *See Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *8 (Del. Ch. June 6, 2018) (dismissing an implied covenant claim "based upon the same conduct as [a] contract claim[]").

[348] Compl. ¶¶ 188–92.

[349] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

parties focus their arguments on whether Plaintiffs have adequately pled "knowing participation" by the alleged aiders and abettors.[350]

An adequate pleading of "knowing participation" requires the plaintiff to well plead scienter.[351] "To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind."[352] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove."[353] Yet it is not impossible.

"A claim of knowing participation need not be pled with particularity."[354] There must, however, "be factual allegations in the complaint from which knowing participation can be reasonably inferred."[355] Under Delaware law, "the knowledge

---

[350] *See* DOB at 53 ("Plaintiffs fail the 'high bar' heightened aiding and abetting pleading standard that a defendant must have 'acted with scienter.'").

[351] *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015) (quoting *Malpiede*, 780 A.2d at 1097) ("As an example, this Court has said that 'a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.'").

[352] *Id.* at 862 (internal quotation omitted).

[353] *Id.*

[354] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *16 (Del. Ch. Mar. 26, 2018) (internal citation and quotation omitted).

[355] *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990).

of an agent acquired while acting within the scope of his or her authority [and the acts of agents within that scope] [are] imputed to the principal."[356]

### a. Noronha, Michael Riady, Stephen Riady, Waterloo and LCR

The Complaint alleges that a complex web of principal-agent relationships existed inside the Lippo Group. A careful study of the Complaint reveals well-pled allegations that Cooper, DXS and PacNet were "agents" acting for each of the other members of the Lippo Group.[357]

In *Metropolitan Life Insurance Company v. Tremont Group Holdings*, the court applied agency law to find that plaintiffs had stated a claim against a corporate parent for aiding and abetting its subsidiary's breach of fiduciary duty.[358] The court based this holding on three allegations: (i) the parent "dominated and controlled" its

---

[356] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012).

[357] Compl. ¶¶ 65 ("Michael Riady, Stephen Riady, LCR, and Noronha directed DXS, PacNet, and Cooper to file the declaratory judgment action in Delaware."), 72 ("Stephen and Michael Riady . . . directed and controlled Cooper, Noronha, DXS and PacNet as their agents at all relevant times."), 122 ("The Riadys . . . directed Cooper and Noronha to" take the Unauthorized Acts.), 137 ("Cooper, Noronha, PacNet, and DXS were agents of Michael Riady, Stephen Riady and LCR."), 168 ("Cooper was an agent of Noronha, Michael Riady, Stephen Riady, and LCR."), 175 ("DXS and PacNet were agents of Noronha, Michael Riady, Stephen Riady, and LCR."), 128(c), (g) (Michael Riady was Cooper's boss and could fire Cooper.), 128(h) (Stephen Riady hired Noronha and directed him to participate in SMP's management.), 128(h) (Cooper would check with the "family" before making decisions.), 128(p), (f) (The LCR board approved the Lippo Group's acquisition of the Noble Loan and selected Cooper as DXS and PacNet's representative on the SMP Board.), 35 (DXS and PacNet were LCR's wholly owned subsidiaries.).

[358] 2012 WL 6632681, at *19.

83

subsidiary, (ii) the parent "was aware of the existence of" its subsidiary's fiduciary duty and (iii) the parent was aware "that [it] exerted exclusive control over" the subsidiary.[359]   Indeed, as noted, under general tenets of principal-agent law, an agent's knowledge is imputed to its principal.[360]

As in *Metropolitan Life*, the Complaint alleges DXS and PacNet's principals—Michael Riady, Stephen Riady and LCR—were aware of their agents' fiduciary obligations.[361]  Because it is reasonably conceivable that DXS, PacNet and Cooper were each of Michael Riady, Stephen Riady and LCR's agents, the knowing participation element has been well pled since an agent's knowledge is imputed to its principal.[362]

---

[359] *Id.*, at *19; *see also In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May, 3, 2004) (same).

[360] *In re Am. Int'l Gp.*, 976 A.2d at 887; *see also* 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 790 ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.").

[361] Compl. ¶ 151.

[362] *Metro. Life*, 2012 WL 6632681, at *19.  At first glance, it might appear inconsistent to impute DXS, PacNet and Cooper's knowledge up to their principals for purposes of aiding and abetting liability but *not* to impute fiduciary duties that may lie with the agent/controller up to that fiduciary's principal.  The key distinction lies in the scope of DXS, PacNet and Cooper's agency.  While the Alleged Controllers may not have had a right to force fiduciaries to breach their duties, "[t]o the extent they serve as [agents of the Lippo Group], the scope of their agency [could include] the faithful expression of the [Lippo Group's] instructions and, if so instructed, faithful reporting back to the parent." DeMott at 254.  Accordingly, it is reasonably conceivable that DXS, PacNet and Cooper

Noronha and Waterloo, however, present a different story, albeit with the same ending. The Complaint alleges Noronha was Cooper, DXS and PacNet's principal, but no facts corroborate that conclusory assertion.[363] If anything, the Complaint depicts Noronha more as DXS's agent and Cooper's peer since he was DXS's Board observer.[364] While Noronha may not have been a principal, I am satisfied Plaintiffs have well pled his knowing participation since Noronha personally assisted Cooper as he engaged in the Unauthorized Acts.[365] Similarly, I find it reasonably conceivable Waterloo knowingly participated in Cooper's breach since it was the entity the Lippo Group used to acquire the Noble Loan.[366]

Lippo argues the Complaint fails to plead facts in support of an inference that Stephen and Michael Riady and LCR consented to DXS, PacNet and Cooper acting

---

agreed to serve as agents for Michael and Stephen Riady and LCR by keeping them informed, and that the knowledge the acquired as fiduciaries, therefore, can, as a matter of law, be imputed to their principals.

[363] Compl. ¶¶ 168, 175.

[364] Compl. ¶ 28.

[365] Compl. ¶¶ 121, 128(r).

[366] Compl. ¶ 17.

as agents on their behalf.[367]  I disagree.  Given the overall ownership and organizational structure, as alleged, it is reasonable to infer this consent.[368]

### b. Noble

Plaintiffs assert they deserve an inference that Noble knowingly participated in DXS, PacNet and Cooper's breaches of fiduciary duties.[369]  I disagree.  After reading the Complaint as a whole and granting Plaintiffs all reasonable inferences, it is not reasonably conceivable that Noble knowingly "attempt[ed] to create or exploit conflicts of interest" at the SMP level.[370]  Noble was not in a principal-agent relationship with any constituents of the Lippo Group and, therefore, there is no basis to impute knowledge of DXS, PacNet and Cooper's breaches to Noble on that ground.  Noble was an arm's length lender and customer to CSM; it was in no way affiliated with the Lippo Group.  And Noble sold the Noble Loan at a substantial loss—undercutting any inference it was exploiting conflicts of interest.[371]

Plaintiffs' speculative allegations that Noble was motivated to sell the Noble Loan to the Lippo Group out of some self-interest, at best, recount an arms-length

---

[367] DOB at 40; PAB at 64.

[368] Compl. ¶¶ 72, 128, 137, 168, 175.

[369] Compl. ¶¶ 188–92.

[370] *Malpiede*, 780 A.2d at 1097.

[371] Compl. ¶ 111.

contractual counter-party's commercial incentives.[372]  Reading the Complaint as a whole, Noble was a third-party lender (and customer) that got stiffed for $30 million.[373]  When CSM defaulted, Noble negotiated the Fourth Amendment and told all parties (including Plaintiffs) that it "may be willing to sell the Noble Loan."[374]  Plaintiffs' conclusory allegations that Noble was obliged to open the bidding process for the Noble Loan by advising Plaintiffs it was willing to sell "at a substantial discount" are not well pled.[375]  More to the point, Noble's alleged "failure" to tell Plaintiffs it was willing to discount is a far cry from "knowing participation" in a breach of fiduciary duty.[376]

*****

Defendants' Motions to Dismiss Count 10 are denied as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR, but granted as to Noble.

---

[372] Compl. ¶ 82.  *See Malpiede*, 780 A.2d at 1097 (noting that a putative contractual counter-party is entitled to negotiate in furtherance of its self-interest without facing aiding and abetting liability) (citations omitted).

[373] Compl. ¶ 50.

[374] Compl. ¶ 82.

[375] *Id.*

[376] *RBC Capital*, 129 A.3d at 862 ("[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove.").

### 5. Civil Conspiracy (Count 11)

In Count 11, Plaintiffs bring a civil conspiracy claim against Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady and LCR.[377] "Delaware law imposing liability for civil conspiracy is well settled."[378] Plaintiffs must allege "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage."[379]

I have already determined that Plaintiffs have well pled a conspiracy among Stephen Riady, Michael Riady, LCR, Cooper, Noronha and Waterloo—satisfying the first element. Lippo has not challenged the third element (actual damage), so I focus on the sufficiency of Plaintiffs' pleading of the second element (an unlawful act in furtherance of the conspiracy).

---

[377] Compl. ¶¶ 193–97. At the outset, I observe the similarity between Plaintiffs' aiding and abetting claims and their civil conspiracy claims renders the Motions to Dismiss Count 11 "almost without real-world purpose." *Allied Capital*, 910 A.2d at 1039. This is because "the prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in wrongful activity [while] aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct." *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2 (Del. Super. Ct. Nov. 30, 2004). Given my holding that Plaintiffs have stated a claim for aiding and abetting, it is unclear what the real-world distinction between Counts 10 and 11 will be. *See Malpiede*, 780 A.2d at 1098 n.82 (questioning whether there is a "meaningful" distinction between aiding and abetting and civil conspiracy under similar circumstances). But, for the sake of completeness, I address Plaintiffs' civil conspiracy claim separately.

[378] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

[379] *Id.* at 149–50.

Lippo argues Plaintiffs have failed to allege a "wrong by *each* defendant individually which would be actionable absent the conspiracy."[380] Even if this were a legal requirement to state a civil conspiracy claim, I disagree with the argument as a matter of pleading. I have already determined the Complaint pleads facts supporting a reasonable inference the members of the Lippo Group agreed to harm SMP.[381] To advance this plan, it is reasonably conceivable DXS, PacNet and Cooper breached their fiduciary duties, while Stephen Riady, Michael Riady, Noronha, Waterloo and LCR aided and abetted those breaches.[382] As a result, Lippo's Motion to Dismiss Count 11 must be denied.

---

[380] DOB at 56 (citing *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1066 (Del. Ch. 1989)); DRB at 25 (citing *Abbott v. Gordon*, 2008 WL 821522 (Del. Super. Ct. Mar. 27, 2008), *aff'd*, 957 A.2d 1 (Del. 2008)).

[381] I address the Lippo Group's conspiracy in Section II.A.1. *CMS Inv. Hldgs.*, 2015 WL 3894021, at *22 (The existence of a conspiracy "can be inferred from the pled behavior of the alleged conspirators."). For reasons stated above, Plaintiffs have stated a claim (i) against PacNet, DXS and Cooper for breaches of contractual fiduciary duties and (ii) against Stephen Riady, Michael Riady, Noronha and LCR for aiding and abetting breaches of fiduciary duties.

[382] *Hamilton P'rs*, 11 A.3d at 1198 ("Sufficiently pleading a claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Instituto Bancario* test" which requires pleading that "a conspiracy existed."); *Triton Const. Co., Inc. v. Eastern Shore Elec. Serv., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) ("[T]he underlying conduct that might give rise to a civil conspiracy is identical to that which forms the basis for the claims against Elliott and Eastern for aiding and abetting a breach of Kirk's fiduciary duty. Kirk is liable for the underlying breach of fiduciary duty, and Elliot and Eastern are liable for aiding and abetting that breach.").

### 6. Tortious Interference (Count 4)

In Count 4, Plaintiffs allege Cooper, Noronha, Waterloo, Michael Riady, Stephen Riady and LCR were aware of DXS and PacNet's obligations under the SMP Agreement, yet these defendants "caused" DXS and PacNet to breach their obligations.[383]  According to Plaintiffs, taken together, these actions constitute tortious interference with the SMP Agreement.[384]

"Under Delaware law, the elements of a claim for tortious interference with a contract are: (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[385]  The tort is "intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance."[386]  I have already determined the Complaint well pleads the existence of a contract (the SMP Agreement) and reasonably conceivable breaches of the contract (DXS, PacNet and Cooper's breach of contractual fiduciary duties).  I address the issues that remain in dispute below.

---

[383] Compl. ¶¶ 150–54.

[384] PAB at 91–93.

[385] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[386] *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994).

*First*, Lippo rightly asserts "employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role."[387] Plaintiffs do not allege Cooper exceeded the scope of his authority. To the contrary, Plaintiffs allege Cooper, as agent for DXS and PacNet, implemented their exercise of contractual Blocking Rights.[388] Under these pled facts, Lippo is correct that Cooper, as an agent of two parties to the SMP Agreement, cannot be held liable for tortiously interfering with the SMP Agreement.

*Second*, Lippo makes several arguments based on the "affiliate exception" to tortious interference with contract to support dismissal of the claim as to other members of the Lippo Group.[389] The affiliate exception "requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract."[390] When, as here, the alleged interference comes from individuals or entities that share common "economic interests" with a party to the contract, plaintiffs must "demonstrate that an interference by an affiliated entity was

---

[387] DOB at 50 (quoting *Shearin*, 652 A.2d at 590; DRB at 26).

[388] Compl. ¶ 69.

[389] *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 31, 2013); DOB at 51.

[390] *AM Gen. Hldgs.*, 2013 WL 5863010, at *12 (internal quotation omitted).

motivated by some malicious or other bad faith purpose."[391]  Our courts have characterized this standard as a "stringent bad faith standard."[392]  And, in this context, a defendant acts in bad faith when it is not "pursuing [] the legitimate profit seeking activities of the affiliated enterprises."[393]  Because the affiliate exception turns on the same bad-faith standard as Lippo's third argument (justification), for the sake of efficiency, I address both, together, below.

*Third*, Lippo asserts that Plaintiffs have not pled that the Lippo Group's "sole motive" was to interfere with the SMP Agreement with no business purpose.[394]  This is an attempt to invoke the "justification defense" to tortious interference with contract.[395]  To determine whether an interference is improper, or unjustified, Delaware courts turn to the RESTATEMENT (SECOND) OF TORTS and employ a multi-factor balancing test.[396]  One of the factors in the test is the alleged interferer's *motive* for interference.[397]  In this regard, our law seeks to preserve a parent's ability to

---

[391] *Id.* (internal quotation omitted).

[392] *Allied Capital*, 910 A.2d at 1039; *see also NAMA Hldgs.*, 2014 WL 6436647, at *26–36.

[393] *AM Gen. Hldgs. LLC*, 2013 WL 5863010, at *12.

[394] DOB at 51; DRB at 26.

[395] *NAMA Hldgs.*, 2014 WL 6436647, at *25–36; DOB at 51; DRB at 26.

[396] *NAMA Hldgs.*, 2014 WL 6436647, at *26.

[397] *Id.*, at *29–30.

cause its subsidiaries to breach contracts when doing so would "increase[] societal wealth by enabling parties to exit from inefficient contracts and transfer assets or services to a higher valued use."[398] In other words, Delaware preserves a corporate parent's ability to engage (or cause its subsidiary to engage) in efficient breach of contract. As a result, "the relevant inquiry in the parent-subsidiary context is whether the parent was pursuing in good faith the legitimate profit-seeking activities of the subsidiary that was a party to contract."[399]

The affiliate exception and the justification defense both turn on good faith, or more precisely, the absence of bad faith. Given my findings with respect to other aspects of the Complaint, it should come as no surprise that I find it reasonably conceivable from the pled facts that Noronha, Michael Riady, Stephen Riady and LCR "intended to injure [SMP] maliciously or in bad faith" in a manner that goes beyond mere efficient breach of contract.[400] Efficient breach assumes the breach of contract will "increase societal wealth."[401] Here, in stark contrast, as pled, the Lippo Group's plan was to "sit back," cause SMP to "collapse[]," and then "buy [CSM]

---

[398] *Id.*, at *30.

[399] *Id.* (internal quotation omitted).

[400] *Id.*

[401] *Id.*

93

out of bankruptcy very cheap."[402] In short, as pled, the Lippo Group was engaging in a zero-sum-game that is inconsistent with a pleading-stage justification defense or application of the affiliate exception.

For reasons explained at length elsewhere in this Opinion, I am satisfied Plaintiffs have pled facts supporting a reasonable inference that Noronha, Waterloo, Michael Riady, Stephen Riady and LCR each committed an "intentional act" that was "a significant factor" in DXS and PacNet's alleged breach.[403] For these reasons, the Motions to Dismiss Count 4 must be granted as to Cooper, but denied as to Noronha, Michael Riady, Stephen Riady, Waterloo, and LCR.

## C. Fraud (Counts 1 and 15)

In Counts 1 and 15, Plaintiffs bring fraud claims against Noble, Cooper, Noronha, PacNet, DXS, Michael Riady, Stephen Riady and LCR (the "Fraud Defendants").[404] To state a prima facie case for fraud under Delaware law,[405] Plaintiffs must allege:

---

[402] Compl. ¶ 80.

[403] *Bhole*, 67 A.3d at 453.

[404] Compl. ¶¶ 133–38.

[405] In its Opening Brief, Noble asserts Utah substantive law governs Count 15 because "Utah is the center of the conduct surrounding the negotiation and sale of the [NLA]." NOB at 44 n.32. Plaintiffs do not challenge this assertion. *See* PAB at 69–72. I need not decide which state's law governs Count 15, however, because I find no relevant substantive differences between Utah and Delaware law. *Ameritrans Capital Corp. v. XL Specialty Ins. Co.*, 2015 WL 13697702, at *6 (Del. Super. Ct. Nov. 30, 2015) (If there is a "false

(1) A false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[406]

Under Court of Chancery Rule 9(b), Plaintiffs must plead fraud with particularity.[407] "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[408] Plaintiffs must also plead their reasonable reliance on allegedly fraudulent misstatements and omissions with particularity.[409]

Plaintiffs allege all three types of common law fraud: affirmative misstatements, silence in the face of a duty to speak and active concealment of facts

---

conflict" in which "a court's decision would be the same under either choice of law," then "a court does not need to conduct a choice of law analysis.").

[406] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992) (internal quotation marks and citation omitted).

[407] Ct. Ch. R. 9(b); *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017).

[408] *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (internal citation omitted).

[409] *Mooney v. Pioneer Nat. Res. Co.*, 2017 WL 4857133, at *8 (Del. Super. Ct. Oct. 24, 2017).

to prevent their discovery.[410]  In response, the Fraud Defendants fault the Complaint for, *inter alia*, failure to plead reasonable reliance on any of the allegedly fraudulent statements.[411]  Specifically, they argue the Complaint acknowledges the Plaintiffs knew all the facts the Fraud Defendants allegedly omitted or misstated.  In support of this argument, the Fraud Defendants cite the following language from the Complaint:

- "In early April 2015, the **Lippo Group . . . revealed that they had been negotiating with Noble in a series of meetings in Jakarta and Singapore to encourage Noble to cooperate with the Lippo Group in furtherance of its plan to try to forcibly take over the company under imminent threat of declared default.**"[412]

- On January 15, 2015, Cooper "refused to sign" a written consent SMP Board action "authorizing a straightforward pro rata equity financing by the SMP members.  **Instead, the Lippo Group began pushing for a transaction whereby they**, through their affiliate PacNet, would lead a contribution of $18 million, but **would** in exchange **demand full operational and strategic control of the company**."[413]

---

[410] Compl. ¶ 134; *see Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008) ("A claim of common law fraud can arise from three types of conduct: (1) a representation of false statements as true; (2) active concealment of facts that prevents their discovery; or (3) remaining silent in the face of a duty to speak."). *See also KnighTek, LLC v. Jive Commc'ns, Inc.*, 2020 WL 414434, at *7–8 (Del. Jan. 27, 2020) (holding under Utah law that plaintiff must plead justifiable reliance under one of these three theories).

[411] *See* DOB at 44–45.

[412] Compl. ¶ 66 (emphasis supplied).

[413] Compl. ¶ 60 (emphasis supplied).

- "In a March 2015 pleading" DXS and PacNet **filed suit to prevent SMI and CC from making capital contributions** to SMP—including contributions as little as $2.5 million.[414]

Against this backdrop, Plaintiffs say the Fraud Defendants made both intentional misrepresentations and intentional omissions of material facts about: "(i) Noble's willingness to sell the [Noble Loan] at a substantial discount; (ii) their negotiations and agreement with Noble to acquire the Noble Loan through Waterloo [and] (iii) the preparation of the Fourth Amendment. . . ."[415] Plaintiffs allege they *justifiably* relied on these misstatements and omissions by "contribut[ing] funds to SMP" and not acting "to prevent these Defendants from executing their plan."[416]

Even after affording Plaintiffs all reasonable inferences, they cannot make a reasonably conceivable case for justifiable reliance given what they admit they already knew when the alleged fraud occurred. In their efforts to plead claims for breach of contractual fiduciary duty and breach of contract, Plaintiffs have alleged the Lippo Group brazenly used the Blocking Rights to starve SMP of capital and then acquire its assets on the cheap.[417] As the Complaint acknowledges, this plan was hardly a secret. Indeed, Plaintiffs allege the Lippo Group "revealed" they had

---

[414] Compl. ¶¶ 45–46 (emphasis supplied).

[415] Compl. ¶¶ 134, 219.

[416] Compl. ¶¶ 135, 220.

[417] Compl. ¶¶ 45–46, 60, 66, 80.

been "negotiating with Noble" "in furtherance of its plan to try to forcibly take over the company under imminent threat of a declared default" as early as 2015.[418] When Plaintiffs contributed capital after the Fourth Amendment, they did so *knowing* the Lippo Group was trying to tank SMP.[419] The Complaint states that the very *purpose* of the Insider Sale Prohibition (which the Fourth Amendment deleted) was to "prevent one of SMP's members from benefitting from a default by [CSM]."[420] Thus, Plaintiffs contributed capital *knowing* (i) the Lippo Group was trying to strong arm SMP by acquiring the Noble Loan and (ii) they had lost their only contractual means to prevent this outcome.[421]

Plaintiffs argue they relied on the misstatements and omissions by not acting "to prevent" Lippo's "plan."[422] Yet, here again, the Complaint contradicts this claim. When Plaintiffs "promptly and vehemently objected" to Noble selling the Noble Loan, "Defendants ignored Plaintiffs' objections, and the Lippo Group . . . closed

---

[418] Compl. ¶ 66.

[419] *Id.*

[420] Compl. ¶ 92.

[421] Compl. ¶¶ 66, 92.

[422] Compl. ¶ 135.

on its acquisition of the Noble Loan the next day."[423]  In other words, as Plaintiffs have pled it, there was nothing they *could have done* to stop the Lippo Group.

As I have decided elsewhere in this Opinion, Plaintiffs have pled actionable wrongdoing.  They, however, have not pled actionable *fraud*.  As relates to the fraud claims, this is an example of a complaint that pleads itself "out of court by alleging information that defeats [its] claim."[424]  Plaintiffs have not pled justifiable reliance with particularity under Court of Chancery Rule 9(b).  As a result, Counts 1 and 15 must be dismissed.

## III.  CONCLUSION

For the foregoing reasons Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part.  Defendants' Motions to Dismiss Counts 1, 3, 5, 8–9 and 12–15 are **GRANTED**.  Defendants' Motions to Dismiss Counts 2 and 11 are **DENIED**.  As for the remaining counts:

- Defendants' Motions to Dismiss Count 4 are **GRANTED** as to Cooper but **DENIED** as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR.

- Defendants' Motions to Dismiss Count 6 are **GRANTED** as to Noronha, Michael Riady, Stephen Riady and LCR but **DENIED** as to Cooper.

---

[423] Compl. ¶ 17.

[424] *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 249 (S.D.N.Y. 2003), *aff'd*, 80 F. App'x 722 (2d Cir. 2003).

- Defendants' Motions to Dismiss Count 7 are **GRANTED** as to Noronha, Michael Riady, Stephen Riady and LCR but **DENIED** as to DXS and PacNet.

- Defendants' Motions to Dismiss Count 10 are **GRANTED** as to Noble but **DENIED** as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR.

**IT IS SO ORDERED.**